## BOWMAN v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted May 6, 1920. Decided June 2, 1920.)

No. 3363.

1. **Criminal law** ⊂═338(1)—**Evidence inadmissible, unless directly tending to prove matter in issue.**

In criminal trials, no evidence shall be introduced that does not directly tend to prove or disprove the matter in issue.

2. **Criminal law** ⊂═351(10)—**Threats and assault to intimidate witness admissible.**

In a homicide case, where there was only one witness, evidence that defendant threatened the life of such witness and made assaults on her some months after the killing was admissible; there being testimony from which it reasonably could be inferred by the jury that there was a direct connection between the threats and assaults.

3. **Criminal law** ⊂═516—**Homicide** ⊂═156(2)—**Remark of accused to effect that deceased was not first white man he killed admissible.**

In a homicide case, remark of defendant at the time of the killing that deceased was not the first white man he had killed was in the nature of a confession that defendant was guilty of the particular homicide, and, following defendant's statement that, if witness would say she was sorry he had killed defendant, he would shoot her, indicated the state of defendant's mind at the time of the killing; that is, that the killing was done deliberately and maliciously.

4. **Homicide** ⊂═253(1)—**Verdict of first degree murder sustained by evidence.**

In a prosecution for homicide, a verdict of guilty of murder in the first degree *held* sustained by the evidence.

---

⊂═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the Supreme Court of the District of Columbia, Sitting as Criminal Court.

Frank Bowman was convicted of murder in the first degree, and appeals. Affirmed.

Robert I. Miller, of Washington, D. C., for appellant.

J. F. Laskey, U. S. Atty., and Morgan H. Beach, Asst. U. S. Atty., both of Washington, D. C.

ROBB, Associate Justice. Appeal from a conviction in the Supreme Court of the District of murder in the first degree. The evidence for the government was substantially as follows:

On the morning of July 7, 1916, the body of Clarence Keefer was found in Lord's Woods, near Michigan avenue, in this city, lying across a little path or trail, about 15 feet from "a place where the grass was depressed, as if some one had been sitting" there. At the latter spot was found a hat pin, ring, and newspaper. Deceased's home was nearby, and a few minutes before he met his death he had started for a walk in his stocking feet, saying "he would be back in about five minutes."

Esther Brown had known the defendant for a short time prior to the homicide, and on that evening she met him, and the two, after purchasing refreshments, walked to the scene of the homicide and sat down on the grass. Witness heard a noise in the leaves, and defendant suggested it was—

"probably chickens scratching in the leaves; she then heard the noise again, and by this time 'Frank Bowman had gotten up and shot at the man, and the man fell, and by that time I jumped up and I seen the man.' 'By that time he [defendant] had gotten up and shot the man once, and I looked around and seen it was a man, and he [defendant] was loading his gun, and he shot him two more times, and I hollowed, "Stop shooting the man!" and he [defendant] run and grabbed me, and asked me, "Was I going to tell it?" I says, "I haven't anything to do with it;" and he said, "If I thought you would tell it, I would shoot you, and leave you here, too." I said, "No, don't shoot me." ' "

The noise was behind witness, and it was not until after the first shot that she discovered it was a man.

"Then the defendant loaded his revolver and walked over to the man, who was lying down, and shot twice again; that when he made the above remark to her, after shooting the man, he had hold of her arm and the gun in her face."

Witness later discovered the loss of her hat pin, and defendant the loss of his ring, and she identified the hat pin on the witness stand. On their return to the city, witness asked defendant if he thought he killed the man, and defendant answered, "Yes." Thereupon witness expressed regret, and defendant replied:

"If you say you are sorry I killed that man, that white man, I'll shoot you anyway."

Thereupon, over the objection and exception of the defendant, witness was permitted to testify to a remark made by defendant that deceased "was not the first white man I [he] ever killed." On the following Saturday, while witness was ill in bed, defendant came to

her room and declined to allow her to see a newspaper he had with him, saying:

"No; I'm afraid you would see something in here about that man I killed, and you will tell it."

Witness further testified that on the occasion last mentioned—

"defendant had a gun with him, and when asked by witness why he had his gun, he said, 'I carry it all the time.' He taken his gun out and laid it on the table, and I asked him please, because I was scared of the gun, and he said. I should not be scared of the gun. 'I'll probably use it on you some day.' He told me he always thought I would tell he shot the man."

Thereafter witness and defendant lived together for a time, and after witness left defendant went to see her several times. Finally, on November 19, 1918, as witness got off a street car, she observed defendant approaching with a knife in his hand, and sought and obtained the protection of soldiers who were near. The next morning, as witness was about to take a car to go to her work, the defendant—

"walked across the street toward her, and caught hold of her arm, and told her to turn around and go back home; that the witness refused, saying she was going to work, and the defendant said, 'I'm going to shoot you this morning; I'm going to kill you;' that the defendant then pulled a gun and shot her five times."

The testimony concerning these two assaults was admitted over the objection and exception of the defendant. There also was testimony to the effect that after his arrest defendant had admitted the killing, but claimed it was done in self-defense.

The defendant, testifying in his own behalf, claimed that the deceased attacked him, "and they came to close quarters, and deceased grabbed his hand and tore the ring off," and defendant shot him in self-defense; that—

"he had difficulty with the Brown woman. She told him, 'That is all right; I am going to get even with you. I am going to fix you.'"

Later in his testimony witness stated that the Brown woman had said to him "that she intended to get me [him] out of the way."

In rebuttal the government introduced evidence, both lay and medical, tending to show:

That the deceased was crippled in both hands, and had been since the age of 12 or 14 years; "that his hands were curved like claws; * * * that he could not lace his shoes or button his clothes; the tips of the fingers and thumb were contracted toward the palm, which made it impossible for him to pick up anything."

[1] The rule is universal in criminal trials that no evidence shall be introduced that "does not directly tend to the proof or disproof of the matter in issue." Com. v. Horton, 2 Gray (Mass.) 354. In Burge v. United States, 26 App. D. C. 524, the rule was thus stated:

"The government cannot prove against the defendant any crime not alleged, in aid of the proof that he is guilty of a crime charged. Whatever tends directly to prove a defendant guilty of the crime charged, although guilty also of another, may be shown against him; but his cause cannot be prejudiced by the evidence disclosing irrelevant guilt. * * * This doctrine is not car-

ried so far as to exclude evidence which has a direct tendency to prove the particular crime for which the prisoner is indicted."

In that case it was held error to permit the introduction of evidence of another crime, because the record failed to show "such threats and declarations as might have made the later crime reflect light upon the intent of the appellant in committing the earlier crime." In State v. Mace, 118 N. C. 1244, 24 S. E. 798, evidence was held admissible to the effect that shortly after the homicide defendant had threatened to shoot a witness, when it was discovered that witness was on his way to inform the family of the deceased. In Funk v. United States, 16 App. D. C. 478, where the defendant was convicted of murder, the court sustained the right of the government to prove a contemplated assault by the defendant on a police officer for the purpose of effecting an escape. In Bird v. United States, 180 U. S. 356, 21 Sup. Ct. 403, 45 L. Ed. 570, the homicide had been committed in the presence of three witnesses. It was held error to permit one of those witnesses to testify that some months later the defendant was very disagreeable, and tried to "pick a fight" with another member of the party. The court said:

"The matters so testified to took place 6 months after the alleged murder, and would seem to have no bearing, direct or remote, upon the guilt of the accused, but still may have tended to persuade the jury that Bird was a dangerous man and likely to kill any one who excited his anger."

[2] The present case differs very materially in its facts from the Burge and Bird cases. The crime was committed in the presence of a single witness, and the testimony shows that the defendant, fully realizing the importance of intimidating that witness and preventing a disclosure of the crime by her, threatened her life. He repeated the threat on the way home, and, to make certain that his attitude was fully appreciated by the witness, he went to see her within a few days, while she was ill in bed, exhibited to her the same weapon with which he had committed the crime charged, and said to her, "I'll probably use it on you some day," at the same time giving expression to his fear that she "would tell he shot the man." Moreover, the defendant's testimony shows that he appreciated the danger of disclosure from this witness, for on the stand he stated that she said to him at different times:

"I've got it in for you;" "I'm going to get even with you;" that she "intended to get me [him] out of the way."

If the jury believed that defendant threatened the life of Esther Brown, as testified by her, the testimony of the assaults made in pursuance of those threats had a legitimate bearing upon the question at issue, the intent of defendant in committing the act charged, for there would have been no occasion for an innocent man to resort to such threats and assaults. The same conditions obtained when the assaults were made that obtained at the time of the murder. Esther Brown continued to be the only witness, and defendant's attitude toward her remained the same. Surely, if it is competent to introduce evidence of flight, concealment, and other attendant and incidental facts, such as attempts to bribe a jailer, assaults on or attempts to kill officers

arresting, attempts to break jail, and possession of concealed instruments for that purpose (Funk v. U. S., 16 App. D. C. 494), evidence of attempted consummation of a threat to kill the only witness of a murder is admissible so long as there is testimony from which it reasonably may be inferred by the jury that there was a direct connection between the threats and assaults. That there was such evidence in the present case we think clear. In its charge the court carefully protected the rights of the defendant in this regard, and no fault is found with the charge.

[3] As to the contention that it was error to permit the witness Esther Brown to relate the alleged remark of the defendant to her to the effect that deceased was not the first white man he had killed, little need be said. This statement was in the nature of a confesstion that defendant was guilty of the particular homicide. Following, as it did, defendant's statement that, if witness would again say she was sorry he had killed "that white man," defendant would shoot her, it indicated clearly the state of defendant's mind at the time of the killing; in other words, that the shooting was done deliberately and maliciously.

[4] The defendant has been represented, both at the trial and here, by able counsel, who has carefully protected his rights throughout. He has been given a fair and impartial trial, the verdict is sustained by the evidence, and, there being no error in the record, the judgment must be affirmed.

Affirmed.