### KRAUS v. UNITED STATES.
### No. 10664.

Circuit Court of Appeals, Eighth Circuit.
Jan. 22, 1937.

Rehearing Denied Feb. 17, 1937.

J. E. Carroll and Frank H. Sullivan, both of St. Louis, Mo., for appellant.

Henry G. Morris, Asst. U. S. Atty., of St. Louis, Mo. (Harry C. Blanton, U. S. Atty., of Sikeston, Mo., on the brief), for the United States.

Before SANBORN, WOODROUGH, and BOOTH, Circuit Judges.

WOODROUGH, Circuit Judge.

The appellant, Harry Kraus, was indicted with seven others for the substantive offense of unlawfully transporting and causing to be transported a certain stolen Chevrolet coach in interstate commerce from University City, a suburb of St. Louis, Mo., to Des Moines, Iowa, knowing the same to have been stolen. The indictment was stricken as to one of the defendants, three pleaded guilty, and the remaining four, including Harry Kraus, stood trial and were convicted. This appeal is on behalf of Harry Kraus alone. He made a separate motion for a directed verdict at the conclusion of all of the evidence and took exception to the adverse ruling thereon, and by appropriate assignments of error presents, among other things, that there was no substantial evidence to sustain his conviction.

There was no direct evidence of any overt act done by Harry Kraus in the theft of the car or in its transportation or in its sale or in obtaining or attempting to obtain the proceeds of the sale or any part thereof. In order to sustain the conviction the government relies entirely upon the proof of the circumstances under which the Chevrolet car described in the indictment and three other cars were stolen in and about St. Louis, disguised, changed as to certain numbered parts, and transported to Des Moines, Iowa, and sold there within a short period of time. It contends that the circumstances as a whole establish guilty knowledge and participation in the offense of transporting the Chevrolet car on the part of Harry Kraus.

Our search of the record discloses that:

There was testimony tending to show that during the year 1935 Harry Kraus was engaged in carrying on an automobile salvaging business at his wrecking yard located at O'Fallon and Sixteenth streets in St. Louis, Mo. He had made registration under the Missouri fictitious name registration act (sections 14342–14346, Rev. Stat.Mo.1929 [Mo.St.Ann. §§ 14342–14346, pp. 8163, 8164]), and carried on the business with the assistance of the defendant John Schaeffer, whom he employed as "manager," under the name "Sixteenth Street Auto Salvage Company."

The defendant Henry Bush carried on a used car business on a farm just outside of St. Louis, and defendant Fred Thomas was a partner in the Capitol Auto Market of Des Moines, Iowa, dealing in used cars in that city. Kraus and Bush and Thomas were well acquainted and had dealings together. The other three defendants were workmen who helped steal, disguise, and transport automobiles.

On different dates in June and July, 1935, four automobiles, including the Chevrolet coach described in the indictment, were stolen at different places in St. Louis, Mo., and were disguised and transported to Des Moines to the defendant Thomas, who disposed of three of them by sales and had the other under his control when detected. It was shown by direct evidence that defendant Bush, assisted by the workmen defendants and others, were the persons who stole three of the cars, including the indictment car, disguised them, and transported them to Des Moines, and there delivered them into the control of defendant Thomas; and the circumstances

indicate that they did the same as to the fourth car.

But the transactions involved more than crude acts of theft, transportation, and delivery of stolen property. The motor vehicle registration laws and identification practices of the manufacturers have made it hard to give a color of title to stolen cars transported in interstate commerce. The theory of the government was that there was a common purpose to dress up and disguise the cars stolen and transported by Bush and his helpers from Missouri to Des Moines so that they were made to appear eligible for registration and sale in Iowa. It claims that the evidence to show Kraus' participation in the crime charged against him must be looked for in the things that were done and devices resorted to in order to make a colorable showing of title for the stolen cars upon which it was expected that, when they were tranported to Des Moines, they could be registered, licensed, and sold.

Missouri, Illinois, and Kentucky have comprehensive systems for registration of automobiles and transfers, with particular provisions as to dealers, and in Iowa the laws forbid the purchase of a used car without a certificate of registration and transfer from the officer whose duty it is to register the car in the state where it is registered (sections 4964, 4898, Iowa Code 1931).

When the testimony concerning the four cars is considered together, it does become evident that the means the defendants adopted and relied on to accomplish deception of the buyers and the registration officers was substantially the same as to each of the cars that were stolen. That is, it is shown that when Bush and his helpers stole the cars in St. Louis, they tried to obliterate the manufacturers' identification numbers on the stolen cars, and then the attempt was to substitute on each of the stolen cars identification numbers belonging to some other car that had been lawfully registered but had been wrecked or junked subsequent to its registration. Furthermore, in order to make the device effective, the plan of the defendants was to find a wrecked or junked car which had been lawfully entitled to registration and which was of the same make, type, and year as the stolen car; and in each instance such a wrecked or junked car was found to correspond with the stolen car. It may even be argued from the evidence that they picked out cars to steal which would match up with wrecked or junked cars already available. The trick of assimilating the stolen car with the wrecked car apparently could not be, and certainly was not, done so as to deceive trained inspectors, but there was a simulation well calculated to deceive the unwary, and the mode of deception attempted by the defendants was the same as to each of the four stolen cars.

The first of the cars which Bush and his helpers stole was a 1933 Chevrolet sedan, and at the time of the theft in June, 1935, it bore a certain manufacturer's identification number—a large number running into seven figures. When inspected after they transported it to Thomas in Des Moines, and after he had sold it to a firm at Portland, Or., it bore a different number, also in seven figures. The false number was identical with the number upon an engine block which belonged to Kraus' salvage company and which had been taken out of another Chevrolet car of the same year and type. Records show that the block had come from the Automotive Wrecking Company of East St. Louis, in the state of Illinois. That company sold the block to Kraus' salvage company on August 17, 1934, and there is testimony that defendant Schaeffer purposely knocked a hole in it while it was in the Sixteenth street wrecking yard, but the number was left intact upon it.

The next car shown to have been stolen in St. Louis and transported to Thomas in Des Moines was a 1933 Plymouth coach, marked with a secret manufacturer's number identified by an inspector. There is evidence concerning the car to the effect that the defendant Thomas, the Des Moines dealer, had gone to the wrecking yard of the defendant Kraus at Sixteenth and O'Fallon streets in St. Louis very shortly before the Plymouth car was delivered to him in Des Moines and had there examined a wrecked 1933 Plymouth automobile of the same particular type, and that he made a notation of the identifying numbers which were on the wrecked car. It also appears that Thomas had agreed to pay, and did pay, Kraus' salvage company "for the numbers" appearing on the wrecked car with the understanding that Thomas was to have the title. The inspector subsequently found the wrecked car in Kraus' wrecking yard in St. Louis with the numbers upon it and the identical numbers belonging to the wrecked car appeared upon the stolen car in Des Moines. Upon the arrival of the

stolen car in Des Moines, Thomas was heard telephoning from Des Moines to the salvage company in St. Louis urging defendant Schaeffer to send the "title" on to Des Moines. Defendant Bush also, shortly afterwards, sent a note by one of his helpers (defendant Curtis) to the defendant Harry Kraus about this same 1933 Plymouth coach, which note was delivered to Kraus personally at his place of business in St. Louis. The note "was to the effect that this Plymouth was delivered to the 'Capitol garage' (meaning to defendant Thomas in Des Moines) and asks that Mr. Kraus send title to that car to Mr. Bush so he could take it on his next trip there and deliver the title to the party who bought the car." Kraus told the note bearer that the title (meaning the title to the wreck) was lost and "he was unable to send it." The title to the wrecked car was not obtained and Thomas could not sell this stolen car. It remained in a private garage in Des Moines, unsold.

The transportation of the other two stolen cars from St. Louis to Thomas in Des Moines was, in many respects, a single transaction carried out by Bush and the helpers under Bush's direction about July 20, 1935. The defendant Thomas effected the sale of both of these cars to the Swift Auto Company of Des Moines, and each of the two bills of sale purporting to convey title to the cars to the Swift Company was dated and acknowledged before a notary July 29, 1935, and each bore the signature "16th St. Auto Salvage Co., John Schaeffer," as vendor.

One of these cars was an L-4, 1932 Ford, which was misbranded with numbers taken from another car of the same make, type, and year. This latter car had been wrecked while on a trip from Kentucky to Yellowstone Park and bore Kentucky license plates. The wreck was sold to defendant Kraus' company by a man named Aschen. Aschen received a check in the sum of $65 in payment for the wreck and the check was written by the defendant Kraus.

The other stolen car was the one described in the indictment, a 1932 Chevrolet coach. It was misbranded with numbers taken from a car, of the same make, type, and year, that had been burned. The burned wreck was offered for sale by the Automotive Wrecking Company of East St. Louis, Ill., and was inspected by the defendant John Schaeffer, Kraus' employee.

According to the record in evidence, however, a transfer slip covering the wreck was made by the Illinois company to the defendant Bush, and so it would appear to be the only one of the registered wrecks used by the defendants in their misbranding which they did not get directly from Kraus' salvage company.

All of these transactions concerning the stealing of the four cars and the description and history of the wrecks from which the false numbers were taken are developed in great detail in the testimony. Several of the participants turned state's evidence and gave the minute circumstances of the thefts and the "work" done on the numbers, the transportation of the cars and steps taken to preserve secrecy, and the final effecting of sales to innocent purchasers in Iowa. The four stolen cars each had several identifying numbers and marks and so did each of the wrecks, the numbers always being very large numbers. To keep track of them is no small task and they are omitted here to avoid confusion.

The circumstances make it very clear that the considerable number of persons who are shown to have engaged in carrying out the enterprise were necessarily closely co-operating with each other, and that the supplying of the wrecks and the "numbers" was an integral part of the enterprise. But on this particular charge against Kraus, of the interstate transportation of the Chevrolet coach, the government stresses the additional light given by the two letters, Exhibits 5 and 30, also in evidence and the circumstances surrounding them.

The transfers of the two automobiles to the Swift Auto Company of Des Moines by bills of sale signed with the name of Kraus' company as grantor were made July 29, 1935. On the 2d day of August the purchaser wrote the letter, Exhibit 30, from Des Moines to the Sixteenth Street Auto Salvage Company in St. Louis, as follows:

"August 2, 1935.

"Mr. John Shaffer
"16th St. Auto Salvage
"St. Louis, Mo.
"Dear Sir:—

"Because the 1932 Chev. Coach which we purchased from you was not licensed in 1935 the State of Iowa wants $22.00 for a 1935 License.

"What can you buy the license for for this car, and also the 1932 Ford Coach, if it has not been licensed for 1935?

"1932 Chev. Coach Eng. No. 3213451

"1932 Ford Tudor Model B. Eng. No. 5018976

"Let us know about this at once as we want to get these cars licensed as soon as possible."

It will be noted that the letter does not suggest that the purchaser, at the time of writing, had had any question or trouble about the titles to the two cars interfering in any way with Iowa registration. The context of the letter relates only to the expense of Iowa registration for the (whole) year 1935, it being then August. The inquiry is what could a transferee's license be had for in Missouri.

Bearing in mind that the Ford number in the letter was the number taken from the wreck of the Kentucky car bought and paid for with Kraus' $65 check and that the Chevrolet coach number set forth in the letter was the number upon the burned car wreck which Schaeffer had inspected in the East St. Louis, Ill., wrecking yard, it became relevant to inquire what action Kraus and Schaeffer took upon their receipt of the letter from the Des Moines purchasers.

The testimony for the government is that when the letter was received in St. Louis, Schaeffer notified Bush of the contents and Bush sent his helper, defendant Don Curtis, to see Kraus and Schaeffer "about these cars that have been taken up there" (to Des Moines), to have Kraus and Schaeffer "write to Des Moines—and straighten the numbers up with the people who had bought the cars." Don Curtis was the man who had driven the stolen Chevrolet, the indictment car, up to Des Moines under Bush's direction, and he also had knowledge of the transportation and misbranding of both the cars referred to in the letter. He discussed the Chevrolet car as well as the Ford car with Kraus and Schaeffer in their office, and after the discussion he wrote a letter to the Des Moines purchasers which was in his own handwriting, but which was directed, so far as the contents were concerned, by Kraus and Schaeffer. He left the letter with them at their office, and it found its way through the mails to the Des Moines purchasers. It reads:

"Mr. L. M. Smith,

"Swift Auto Exchange

"Des Moines, Iowa.

"Dear Sir:

"In regard to Chev. coach 1932 Eng. No. 3213451—also Ford Tudor Eng. No. 5018976.

"When I bought the ford it had 1935 Kentucky plates. I do not know the license no.

"You can write to the Ken. license bureau.

"The Chev. coach had no license plates. Missouri law do not permit licenses to be transferred to anyone else. You can write to Jefferson City license bureau for Chev. record.

"I have checked motor numbers and find them to be alright.

"Yours very truly,

"John Shaffer

"16th St. Auto Salvage

"East St. Louis Automotive Wrecking Co."

There is no denial in this answering letter of the statement of the Des Moines purchasers that they had bought the cars from Kraus' company. On the contrary, the letter of the salvage company impliedly acquiesces in the statement of the purchaser's letter concerning the car "which we purchased from you" and undertakes to answer the questions of the purchasers and to assist them in the matter of registration of the cars at the least cost. The numbers in the purchasers' letter told Kraus and Schaeffer the whole story about the two cars, and their statement, "I have checked motor numbers and find them to be alright," is only compatible with knowledge and participation in the transactions and with a guilty intent on their part to inform and aid the customer at the sale, which sale was the final consummation of the whole enterprise of stealing, disguising, transporting, and transferring the two cars.

Kraus took the stand on his own behalf and made a single statement that he had never in his life had any conversation with Don Curtis. Schaeffer testified at length. He said that he had not sold Thomas "the numbers" to the wrecked 1933 Plymouth coach, but that the wreck itself was sold to Thomas. According to Schaeffer, Thomas agreed to pay $125 for the wreck, $100 down and the remainder when title was furnished. The title was never obtained, so only $100 was paid and the wreck was left in the yard. Schaeffer denied that he and Kraus had directed Curtis to write the answer to the letter of the Des Moines purchasers above set forth. He said that he had merely called Bush's attention to the letter and contents when it was received from Des Moines and left Bush to answer it. In

other respects his testimony conflicted with the testimony for the government.

The disputes were for the jury. The circumstances, taken in their entirety, were sufficient to justify an inference that Kraus was an active participant, with knowledge, in the enterprise that contemplated and included the unlawful transportation of the described 1932 Chevrolet from University City to Des Moines, knowing it to have been stolen. They support the finding that Kraus aided and abetted in the crime, and so was indictable as a principal. The motion for directed verdict for want of sufficient evidence was properly denied.

Under other numerous assignments of error the appellant contends: (1) That the trial court erred in refusing to consider offers that were made by defendant in the course of the trial to prove that hearsay testimony was heard by the grand jury which returned the indictment, and that there had been no sufficient competent testimony before that body to justify its return of the indictment; (2) that the trial court erred in permitting the prosecutor to refer, in his opening statement, to stolen automobiles other than the one described in the indictment, and in permitting the testimony to be received and considered concerning such other stolen cars.

1. During the trial of the cause counsel for the defendants sought to elicit from certain government witnesses that they had not given testimony before the grand jury, and objections to the questions were sustained and exceptions allowed. At the conclusion of the government's testimony defendants made a general offer to make proof that the grand jury had not heard sufficient competent testimony to justify the indictment. The offer to prove was denied and the ruling excepted to. The rulings are assigned as error.

We are not persuaded that it was the duty of the trial court, after having received the defendants' plea of not guilty and after a jury had been impaneled to try the issues, to interrupt the trial for the purpose of inquiring into the question whether the grand jury had had sufficient competent testimony before it to justify it in returning the indictment. The appellant having entered his plea of not guilty, it was the duty of the court to proceed to the hearing of the testimony upon the issues joined.

"It is well established that a motion to quash an indictment should be made before the plea is filed, and certainly before the jury is sworn." Sherman v. United States (C.C.A.) 80 F.(2d) 629, 630; Murdick v. United States (C.C.A.) 15 F.(2d) 965.

The rulings complained of were right.

2. Our consideration of the evidence as a whole has persuaded us that the testimony concerning the three cars other than the indictment car tended to prove that the several defendants, including Kraus, were jointly engaged in transactions closely related to the particular transaction charged in the indictment. The testimony concerning the related transactions threw light upon the particular transactions charged as unlawful transportation of the stolen Chevrolet car in interstate commerce, knowing it to have been stolen. The fact that the related transactions also constituted crimes is immaterial. The case was one proven by circumstantial evidence where all of the circumstances were shown to have had a material bearing upon the transaction charged in the indictment. Where such related probative circumstances are brought out in the course of the trial of a criminal case, the defendant cannot be heard to object because the circumstances may also implicate him in other crimes not charged. The applicable principle is elementary and is simply expressed in Cossack v. United States (C.C.A.) 82 F.(2d) 214, 216: "The common object of persons associated for illegal purposes forms part of the res gestæ, and acts done with reference to such object are admissible, though no conspiracy is charged. Vilson v. United States [(C.C.A.) 61 F.(2d) 901]; Sprinkle v. U. S. (C.C.A.) 141 F. 811."

We think all of the circumstances shown in this case were material to show that the unlawful transportation charged was a part of an enterprise in which Kraus, along with others, aided and abetted, and as to which he was properly charged and tried as a principal.

Judgment affirmed.