**Arturo RODRIGUEZ, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 18347.**

United States Court of Appeals
Fifth Circuit.

Dec. 7, 1960.

864

Anthony Nicholas, San Antonio, for appellant.

K. Key Hoffman, Jr., Asst. U. S. Atty., Preston H. Dial, Jr., San Antonio, Tex., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Arturo Rodriguez, appellant, with Joe A. Martinez and Raymond De La Cerda, was charged with violations of the federal narcotics laws. Four counts (1, 3, 5, and 7) charged the defendants with unlawfully facilitating the transportation and concealment of a narcotic drug. Four counts (2, 4, 6, and 8) charged the defendants with unlawfully selling heroin. The ninth count charged the defendants with a conspiracy to facilitate the unlawful transportation and concealment and sale of heroin. In his instruction to the jury the trial judge was scrupulously fair to the defendants. Going beyond the necessities of the legal situation, the trial judge charged the jury that "in arriving at a verdict of guilty upon circumstantial evidence, the circumstances must be consistent with each other and must be consistent with the idea of guilt, and must *exclude every other reasonable hypothesis*". See Holland v. United States, 1954, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166; Gregory v. United States, 5 Cir., 1958, 253 F.2d 104, 110. Apparently with particular reference to Rodriguez, the trial judge charged that the "mere presence of the defendants at the time and place the offenses are alleged to have been committed is insufficient to impute guilt to the defendants". After a full week of trial, the jury deliberated for twenty minutes, then returned a verdict of guilty against the defendants on all counts.[1] Martinez appealed. This Court affirmed his conviction in a per curiam opinion. Martinez v. United States, 5 Cir., 1960, 277 F.2d 161.

Rodriguez contends that his position is entirely different from that of his co-defendants. He argues that a close inspection of the testimony establishes that appellant "had no real connection with the narcotics transactions"; that he "knew what was going on, but that is all"; that "he had knowledge of a crime that was about to be committed" but he simply "associated himself with co-de-

1. De La Cerda pleaded guilty to the first eight counts.

fendants when they, not he, were dealing in narcotics".[2]

■ The Court has closely inspected the testimony in the record. We hold that there is ample evidence to support an inference by the jury that Rodriguez conspired with his codefendants as charged in the indictment. We hold also that there is sufficient evidence to support an inference by the jury that Rodriguez facilitated the unlawful transportation and concealment of the heroin and that he participated in the unlawful sale of the heroin.

Arturo Rodriguez owned and ran Arturo's Bar, a beer joint in the Mexican section of San Antonio, Texas. He was a business associate of Joe Martinez and had Joe's unlisted telephone number. He was an old friend of Raymond De La Cerda. They were raised together. Joe and Raymond,[3] indicted as the heroin sellers, spent much of their time at Arturo's Bar. This bar was the focal point for their narcotics activities in this case. There they negotiated the sales and made delivery of the heroin to the Special Employee and informer, Lucas (Mike Lucas) Gonzales. Joe arranged for Lucas to get in touch with him through Rodriguez.

As is usual in narcotics cases, the character of the informer is somewhat less than savory. Lucas is no exception. Lucas, an ex-convict and heroin addict, dealt in stolen goods, specializing in stolen cigarettes. At the time he was employed by the Federal Narcotics Bureau he was under five state indictments. At this time, his wife, who was also a heroin addict, was in the San Antonio jail, and their baby had been taken from them by the San Antonio authorities and placed in a foster home. He needed money and he needed help. The misdeeds and misfortunes of Lucas Gonzales, however, were made known to the jury. The jury chose to believe his testimony, corroborated as it was by the testimony of the Government undercover agent, Louis Cerda, and agents James Carey and John Frost.

The record shows a clearcut pattern in the dealings between the defendants and the informer. In each sale Lucas bartered stolen cigarettes for heroin at Arturo's Bar in the backroom or kitchen behind the bar. A door separated the kitchen from the bar. The negotiations took place in the presence of Rodriguez, but invariably after agreement as to the terms of the trade, the physical transfer of the heroin occurred out of Rodriguez's presence. Rodriguez played a key part at the telephone, when Joe and Raymond were not in his bar. Thus, in order to arrange the second sale, March 9, 1959, Lucas called Rodriguez, with whose voice he was familiar, to ask if Joe were there. He said that he had cigarettes to sell. Rodriguez said that he would reach Joe and told Lucas to call back in fifteen minutes. When Lucas called back, Rodriguez said that he had reached Joe and that Lucas should come over. When Lucas arrived both Joe and Raymond were at Arturo's Bar. The three defendants and Lucas went into the backroom and agreed to a trade of five capsules of heroin for fifteen cartons of cigarettes. After they reached an agreement, Joe, Raymond, and Lucas left the room and walked toward the restroom (outside the main premises). The heroin was transferred there or on the way to the restroom.

The first sale was effected without benefit of telephone—as far as the testimony shows. But Rodriguez had an active and important role in the negotiations and sale. On this occasion, March 4, 1959, Lucas, his wife, and one Joseph Gloria went to Arturo's Bar to sell twelve cartons of cigarettes and four pounds of coffee. Joe, Raymond, and Rodriguez went in the backroom. Lucas asked Joe for "some stuff" (heroin). Rodriguez told Lucas to get rid of Gloria. In the

2. Appellant's brief.

3. To distinguish Raymond De La Cerda, one of the defendants, from the Govern-

ment agent Louis Cerda, the former will be referred to as Raymond.

context one would have to infer that Rodriguez was suspicious of Gloria and that he acted to protect the security of the narcotics transactions. Joe, Raymond, and Lucas then went to the restroom. There, delivery of heroin was made to Lucas.

The third sale was March 15, 1959. Lucas went to Arturo's Bar with about $130 to $150 of stolen merchandise— cigarettes, shirts, some irons, and a radio. Again he went into the backroom with Rodriguez, Joe, and Raymond. Lucas asked for fifteen or sixteen caps of heroin. They settled for twelve. Again Lucas, Joe, and Raymond walked toward the restroom. This time Lucas was directed to go to the "little door" (always locked) to the path leading to the restroom. Joe then handed him twelve capsules of heroin through the slats of the fence.

For the fourth sale, April 27, 1959, the undercover agent Cerda went with Lucas to Arturo's Bar. They took a table near the door. Rodriguez joined them. Lucas asked for Joe, saying that he had some cigarettes for Joe. At Lucas's suggestion, Rodriguez called Joe on the telephone. Unable on this call to reach Joe, Rodriguez waited, then placed a second call, ostensibly to Joe. This call was completed. A short while later, the telephone rang, Rodriguez answered, called Lucas over, and told him that Raymond was on the telephone and wanted to speak to him. Lucas then told Raymond that he had some cigarettes for Joe. Raymond told Rodriguez that Joe was sending over to pick up the cigarettes. Raymond arrived fifteen minutes later and honked his horn. Rodriguez left the bar, then came back and said that Raymond was outside. Lucas went out to the car, spoke to Raymond, came back in, asked agent Cerda for $10, and went out again to Raymond. After driving Lucas around the block, Raymond gave him ten capsules of heroin. About twenty or thirty minutes later Joe drove up, greeted Lucas, and put his arm around him. Lucas told Joe that he had some cigarettes for him, which he had given to

Raymond. Joe said that he knew all about it. They walked inside, Joe leaning a sawed-off shotgun against the bar. Lucas gave agent Cerda the ten capsules. After promising to bring a large quantity of cigarettes the next day, Lucas left with Cerda. Agents Frost and Carey, stationed some distance away, using binoculars, had the defendants, Lucas, and Cerda under surveillance.

No heroin changed hands at the fifth meeting between Lucas and the defendants, April 28, 1959. That encounter is noteworthy in this case, because in the course of the evening Raymond held the undercover agent Cerda at gunpoint. About nine that night Lucas and Cerda went to Arturo's Bar and seated themselves at a table near where Raymond was sitting. Raymond asked Lucas if Cerda was a "man" (officer of the law). Lucas replied that Cerda was all right. Shortly thereafter Lucas and Cerda went to their car. Raymond followed them, stood on the outside of the car on the driver's side, just back of Cerda, and trained a gun on the back of Cerda's head. He talked about taking Cerda and Lucas for a one-way ride. For the next two hours and a half Cerda gripped the wheel and froze his eyes in front of him. During this period Raymond, apparently still keeping Cerda covered, went to the front of Arturo's Bar several times and had conversations with Rodriguez. Rodriguez stood at the door or on a little walk in front of the bar. Rodriguez was thirty to thirty-five feet from Cerda's car. The car was twenty feet from the bar. The bar was reasonably well lighted, there was a floodlight in the front, a light on the top of the building, and a city light on a pole in the middle of the block. At one point Joe drove up in his car, passed Cerda, and engaged in a conversation with Rodriguez. Minutes later a San Antonio Police Department car drove by. The detective noticed that there was an unusually large number of people around Cerda's car. More importantly, he noticed something strange about Cerda who was looking straight ahead, following him with his eyes,

but was not turning to watch him. Then he noticed Joe's car, which he recognized as Joe's, about twenty to thirty-five feet ahead of Cerda's. Rodriguez was standing at the driver's window talking with Joe. After the police car had passed, Raymond went over to talk with Joe and Rodriguez. Raymond returned shortly to Cerda's car and then told the agent and Lucas that they could leave. Carey and Frost, stationed about a block or a block and a half away (that was also about a block away from Joe's home) had observed through binoculars the movements of all of the actors. Carey testified that Rodriguez left the bar and stood outside four or five times before Joe arrived on the scene. Rodriguez denied knowing anything about Raymond's holding a gun on Cerda and Lucas.

In the light of these facts, which are but a sketchy outline of the testimony, the conclusion is almost inescapable that Rodriguez associated with his two co-defendants with full knowledge of their aims and used this knowledge to help them commit the offenses with which they are charged. It seems reasonable to us and it must have seemed reasonable to the jury that Rodriguez's part was to supply a base of operations, a place with privacy and a telephone, and to serve as a connecting link between the buyer and the sellers of narcotics. It is not unreasonable to infer that the magic word was "cigarettes". When Lucas said it, he meant that he wanted heroin; when Joe and Raymond said it, they meant that they would trade heroin for cigarettes and other stolen goods. Not a matter of inference at all is the virtually undisputed fact that Rodriguez made sure that he was present when the preliminary negotiations occurred that would seem to be essential when a sale is by barter. He was on top of the situation at all times, except at the moment of physical delivery of the heroin. His presence was not accidental. The pattern was not by chance. The jury was not so naive as to accept Rodriguez's explanation that he was an innocent bystander.

This Court is not naive, either. See Ginsberg v. United States, 5 Cir., 1938, 96 F.2d 433, 436; Georges v. United States, 5 Cir., 1959, 262 F.2d 426, 431. See also Marino v. United States, 9 Cir., 1937, 91 F.2d 691, 699; United States v. Perez, 2 Cir., 1957, 242 F.2d 867, certiorari denied 354 U.S. 941, 77 S.Ct. 1405, 1 L.Ed.2d 1539.

■ Appellant contends that the district court erred in admitting evidence of Raymond's assault on Cerda and Lucas on April 28; that the conspiracy, if any, ended before the assault began, when Raymond asked Lucas if Cerda was "a man" (officer of the law). The evidence shows no termination of the conspiracy. On the contrary, Raymond was sufficiently dissatisfied with Lucas's answer to hold Cerda for an additional two hours. The evidence shows that during the assault Raymond and Rodriguez consulted frequently and that all three defendants conferred, apparently as a result of which Cerda and Lucas were released. Raymond, the principal actor in the assault, was a codefendant with Rodriguez, appellant, on each count of the indictment including the count charging conspiracy.

■ We consider that the acts of the defendants were a continuing conspiracy extending through the time when by the concerted action of the three defendants, Cerda and Lucas were released. We point out that evidence of an extraneous offense is admissible when it corroborates or supplements the offense charged. United States v. Bucciferro, 7 Cir., 1960, 274 F.2d 540, 542; Schwartz v. United States, 9 Cir., 1947, 160 F.2d 718; United States v. Wall, 7 Cir., 1955, 225 F.2d 905; Kraus v. United States, 8 Cir., 1937, 87 F.2d 656, 661; See also 22 C.J.S. Criminal Law § 683, p. 1092. Here, the assault was a result of the substantive offense, and it throws a direct light on the conspiracy charged against the defendant. See Bowman v. United States, 1920, 50 App.D.C. 90, 267 F. 648, 651. We observe too that there is no evidence of Rodriguez's having dissociated himself from the conspiracy. Ab-

sent such evidence, he has no immunity from responsibility for the acts of his coconspirator. Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593. Nor is he immune from responsibility for the inference a jury may draw from the coconspirator's acts, including an inference of guilt from evidence that a codefendant has attempted to do away with a witness.

The judgment must be affirmed.