**Harry Allen LOWTHER, Jr., et al.,**
**Defendants-Appellants,**

**v.**

**UNITED STATES of America,**
**Plaintiff-Appellee.**

**Nos. 71–1017, 71–1018.**

United States Court of Appeals,
Tenth Circuit.

Jan. 24, 1972.

Rehearing Denied in No. 71–1017
Feb. 23, 1972.

Rehearing Denied in No. 71–1018
April 13, 1972.

Joseph P. Jenkins, Estes Park, Colo., for appellants, Wendell E. Lowry and Lowry Investments, Inc.

Alan H. Bucholtz, Denver, Colo., for appellant, Harry A. Lowther, Jr.

James S. Dougherty, Dept. of Justice, Washington, D. C. (James L. Treece, U. S. Atty., Milton C. Branch, Asst. U. S. Atty., Denver, Colo., Edward J. Barnes, Robert G. Clark, Craig C. Donsanto, Dept. of Justice, Washington, D. C., on the brief), for appellee.

Before SETH, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

The appellants were convicted by a jury of fraud in the sale of securities in violation of 15 U.S.C. § 77q(a).[1] Harry A. Lowther, Jr. was sentenced to 5 years imprisonment under 18 U.S.C. § 4208(b) and Wendell E. Lowry was sentenced to 4 months, followed by 20 months probation. Lowry Investments, Inc. was fined $1,000. Carl E. Courts was found not guilty on all counts. Counts one through six involved 15 U.S.C. § 77q(a), fraud in the sale of securities, and Count seven, 18 U.S.C. § 371, involved conspiracy against the United States. Prior to trial Count seven was dismissed. Count four was dismissed after the Government had presented its case. Lowther was acquitted on Counts three and five, and Lowry and Lowry Investments were acquitted on Counts two and six. The jury did not reach a verdict on Counts two and six as to Lowther or on Counts three and five as to Lowry and Lowry Investments.[2] Lowry, Lowther and Lowry In-

1. Section 17(a), Securities Act of 1933, 15 U.S.C. § 77q(a) provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly, or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

2. Count two involved use of the mails by the appellants on or about December 8, 1965 to send Roy Dickson a letter bearing the name of the Elkton Company; Count three involved use of the mails on or about December 17, 1965 to send Emil Endres

vestments were convicted on Count one involving use of the mails by the appellants on or about December 15, 1965 to send a confirmation of sale to Mrs. Betty Jolkovsky of 2,500 shares of Elkton stock to employ a scheme to defraud, obtain money by means of untrue statements of material facts or to operate a fraud upon purchasers. Lowry and Lowry Investments, Inc. will be referred to as Lowry.

Lowry owned Lowry Investments, Inc. in Colorado Springs, Colorado, and specialized in penny stocks. In 1965 he gained control of three dormant mining companies, Cresson Consolidated Gold Mining and Milling Company, United Gold Mines Company, and The Elkton Company. A board of directors was formed including Lowry, but they never met; minutes were signed, however, indicating that meetings were held. Lowry kept the records of the companies. These three corporations had interlocking boards of directors. In late 1965 the Elkton Company retained El Paso Financial Corporation to serve as its financial manager; it was controlled by Lowther. The offices of Lowry and Lowther were in the same building and they conferred constantly. Resolutions were passed authorizing the sale of 1,480,233 shares of Elkton at 1/10 of a cent per share. The shares were purchased by Lowry, Lowther and their nominees. In November of 1965 Lowry made a tender offer to other Elkton shareholders to buy Elkton stock at 1/4 of a cent per share net. Lowry obtained 230,000 shares in response to the offer. Lowry resigned from the board of directors of Elkton on November 9, 1965. On December 2, 1965 the remainder of Lowry's directors in Elkton resigned.

As manager of Elkton, Lowther began negotiations to purchase two companies in unrelated fields, Chemspray Corporation and Rocky Mountain Rent-A-Car Corporation. Although Elkton was unsuccessful in its dealings, Lowry and Lowther represented to the public that it was doing well. On December 4, 1965 Lowry issued one of his periodic Lowry Investments, Inc. letters to his customers in which he stated that Elkton "could prove to be the speculation of the year for 1966." Lowry offered the stock in this letter at 2 cents per share, double the price quoted in his investment letter two weeks before. The investment letter stated that Elkton was being managed by El Paso; that it had purchased 51% of Chemspray, and projected a substantial cash flow income from this acquisition; that Elkton expected to purchase Econ-O-Car Rentals, which Lowry described as "Chrysler's new entry into the national car rental business"; that a third *"major"* acquisition was contemplated; and that El Paso's goal for Elkton was an income of $100,000 per year.

On December 8, 1965, Lowther issued a letter to Elkton shareholders in which he told of El Paso's intention to convert Elkton into a holding company and to acquire profitable subsidiaries. Lowther listed the members of the new board of directors and their credentials. In several instances the credentials attributed to the members of the board were either inaccurate or misleading. The letter also announced the purchase of Chemspray, and described it as a "leading manufacturer of industrial cleaning equipment and chemicals", with "remarkable growth in sales and profits during the year 1965." Lowther projected gross sales for Chemspray in 1966 at $1,750,000 and profits of $250,000. Its assets were stated to be $166,377, its liabilities $12,580, and stockholders' equity $153,797. In reality Chemspray had no earnings in 1965, it had little cash and there

---

a stock certificate for 2,500 shares of Elkton stock; Count five involved use of the mails on or about December 7, 1965 to send Howard Kuhnle a confirmation of sale of 5,000 shares of Elkton; Count six involved use of the mails on or about March 15, 1966 to send a stock certificate for 50,000 shares of Elkton stock to

Claudius Fingar. Count four involved use of the mails on or about December 8, 1965 to send Homer Rogers a confirmation of sale of 2,500 shares of Elkton stock and Count seven involved conspiracy to commit offenses against the United States.

was no basis for projecting earnings of any substantial amount in 1966.

During December of 1965 Elkton Corporation hired a public relations firm to issue press releases. It was to be paid in shares of Elkton borrowed from Lowther. The information issued was obtained from the Chairman of the Board of Directors, Hamilton Gregg II, and from Lowther. One of the news releases contained information about Chemspray which had been related in the stockholders' letter.

On December 9, 1965 the public relations firm issued a press release concerning Elkton's purchase of Rocky Mountain Rent-A-Car Corporation. Gregg and Lowther supplied the information for the release. The release stated that Rocky Mountain had 197 rental units and that its estimated earnings for 1966 were $310,000. In reality Rocky Mountain was in debt and retained only some 12 rental units.

On December 31, 1965 Lowry issued an investment letter in which Elkton was quoted at 8 cents per share. The letter related Elkton's purchase of 25% of Chemspray with an option to purchase an additional 26%, as well as the purchase of "several" car rental companies. It also stated that Elkton hoped to make a "major acquisition of an established business" within the month.

In January of 1966 Elkton reached 11 cents per share. Lowry's investment letter of January 22, 1966 stated that Elkton had paid $4,000 to redeem the Jerry Johnson gold mine. The letter also stated that Elkton looked "cheap" at 11 cents per share in view of the pending acquisitions. On January 27, 1966 a stockholders' letter was issued by Lowther in which the Jerry Johnson lease was reported along with the acquisitions of Chemspray and Rocky Mountain. It also represented that Elkton was listed on the Colorado Springs Stock Exchange; that Arthur Anderson (sic) and Company were employed as auditors; that an annual report would be issued in 1966; and that the company records would be transferred to computers by Elkton-con-

trolled Accounting Systems Management, Inc., "a specialist in computer bookkeeping serving clients in Colorado." In truth the Colorado Springs Stock Exchange was Lowry's office; Arthur Anderson (sic) and Company declined to serve as Elkton's auditors; and Accounting Systems Management had only recently been established, consisted of two partners, and had no history of earnings.

In February Elkton was quoted at 10 cents per share in Lowry's investment letter. In March a news release announced Elkton had made three acquisitions, Solar Airlines, Hasty House Restaurant chain and Accounting Management Service. Solar Airlines was described as a regional carrier from Mexico to Albuquerque, New Mexico and Dallas, Texas using radar-equipped turbo-jets. Hasty House was described as a franchise with units from Kansas City to the West Coast and Accounting Management Service was described as being able to provide computerized bookkeeping service to all Elkton subsidiaries. The letter was very misleading. It again gave false credentials to members of the board of directors; it stated that one man was on the board when he did not serve; Hasty House was not purchased and it was hopelessly in debt; and Lowther purchased Solar Airlines on a $1 option. Solar Airlines in fact had only five airplanes of which four were not in use. Also Solar Airlines was in debt and the directors did not authorize its purchase.

On March 19, 1966 Lowry published another investment letter in which he repeated these acquisitions. On April 18, 1966 Lowry's letter quoted Elkton at 15 cents per share but noted that trading in the stock had been suspended by the S. E.C. as of 4:30 p. m. on that date because of suspected misrepresentations. It stated that the stock might be overvalued and that the current income was extremely small. As a result of these activities Lowry and Lowther created an artificial market for Elkton stock; the price rose from $\frac{1}{4}$ of a cent on December 2, 1965 to a high of 20 cents on April 14, 1966.

Prior to the S.E.C. suspension, Lowther and Lowry sold almost all of their Elkton stock acquired from Cresson and United. They had purchased their shares at $\frac{1}{10}$ and $\frac{1}{4}$ of a cent per share and sold them at prices ranging from $2\frac{1}{2}$ to 11 cents per share. Lowther and Lowry made tremendous profits.

In the interim private investors purchased Elkton stock. Mrs. Jolkovsky of Atlanta, Georgia, received the December 4, 1965 Lowry investment letter which described Elkton as the potential speculation of the year. She wrote to Lowry about the stock and sent a check for $120 to buy 6,000 shares at 2 cents per share. The order was not filled at that time because the price had risen to $4\frac{1}{2}$ cents per share. On December 15, 1965 she purchased 2,500 shares of Elkton from Lowry at $4\frac{1}{2}$ cents. Encouraged by subsequent letters from Lowry she purchased an additional 4,000 shares at $7\frac{3}{4}$ cents and 3,000 shares at 8 cents on January 10, 1966. She did not receive any information that Elkton's subsidiaries were failing companies or that Lowry and Lowther had personally purchased large amounts of Elkton at $\frac{1}{10}$ of a cent per share and had made large profits in selling the stock. In April of 1966 she purchased 4,000 shares at 9 cents from Lowry Investments. She owned all the shares at the time of the trial.

Lowry and Lowther contend on appeal that: (1) the trial court erred in denying their individual motions for acquittal; (2) the trial court erred in denying their individually raised motions for a new trial; (3) the trial court erred in not granting separate trials; (4) the trial court erred in failing to marshal the evidence and in instructing the jury with respect thereto; (5) the trial court erred in admitting certain exhibits; (6) the verdict is not supported by substantial evidence; and (7) the trial court erred in denying their individually raised motions for a mistrial. In addition Lowther contends individually that: (1) the trial court erred in failing to ask certain tendered voir dire questions; (2) the trial court erred in denying his motion for a directed verdict; and (3) the trial court erred in denying in toto his motion to strike and in allowing the indictment to go to the jury containing unproven allegations.

I.

▮ Lowther and Lowry allege that under Fed.R.Crim.P., Rule 29, their motions for acquittal at the close of the Government's case should have been granted. They allege that the Government failed to produce sufficient evidence to sustain their convictions on the scheme charge. Fed.R.Crim.P., Rule 29, provides for an acquittal upon motion of the defendant after the evidence on either side is closed if the evidence is insufficient to sustain a conviction.

"In deciding a motion for acquittal the trial judge determines whether, considering the evidence in the light most favorable to the government, there is substantial evidence from which a jury might reasonably find that an accused is guilty beyond a reasonable doubt." United States v. Harris, 441 F.2d 1333 (10th Cir.1971) at 1336–1337.

Our review of the record at the close of the Government's case in chief disclosed that the evidence presented by the Government amply demonstrated the existence of a common scheme to defraud with respect to Lowry and Lowther.

Lowry started with a shell corporation, the Elkton Company, which had very little assets. He obtained control of Cresson and United Gold which held substantial blocks of Elkton stock and obtained their Elkton stock by the use of dummy boards and board minutes prepared in advance. Lowry, Lowther and their nominees purchased the outstanding stock for $\frac{1}{10}$ of a cent per share and Lowry purchased an additional 240,000 shares for $\frac{1}{4}$ of a cent per share from stock received in response to a tender offer to Elkton shareholders.

Lowry and Lowther made an agreement to give El Paso absolute control of Elkton, and Lowry Investments was used

as a conduit through which information about Elkton flowed. Mr. Courts worked for Lowther. He drew up documents; was in charge of transfers; took money from Cresson and United Gold and put it into El Paso; and made it possible for Lowry and Lowther to split 1,500,000 shares of Elkton. Shareholder letters, market letters and press releases revealed an improved and encouraging outlook for Elkton stock, based upon a series of alleged acquisitions by Elkton of other enterprises. Investors were not told of the real condition of these companies. These public misrepresentations enabled the Elkton stock to reach artificially high levels at which time Lowry and Lowther sold their shares at inflated prices. Lowther profited by about $66,000 and Lowry's profit amounted to about $68,-000. Mrs. Jolkovsky purchased shares of Elkton because of the representations made in the letters which she received. She was a victim of Lowry's and Lowther's scheme to defraud. Thus on the basis of the record we conclude that the trial judge committed no error in the application of Rule 29.

### II.

■■ Lowry argues that his motion for acquittal should have been granted by the court because the guilty verdict on Count one involved identical evidence which the jury found insufficient on Counts two, three, five and six involving transactions occurring before and after the transaction in Count one. Lowther also alleges that a new trial should have been granted because of the inconsistent verdicts wherein the jury found the appellants guilty under Count one and not guilty on counts which involved identical evidence. They argue that there could be no scheme to defraud because Lowther's acquittal on Counts three and five shows that the jury determined that there was no scheme between Lowther and Lowry in early December of 1965. Thus, they contend, if there was no scheme as to Kuhnle and Endres there could be no scheme against Mrs. Jolkovsky. We disagree. Each count in an indictment is a separate offense and consistency in the verdict is not necessary. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); Speers v. United States, 387 F.2d 698 (10th Cir. 1967), cert. denied 391 U.S. 956, 88 S.Ct. 1864, 20 L.Ed.2d 871 (1968); Maxfield v. United States, 360 F.2d 97 (10th Cir. 1966), cert. denied 385 U.S. 830, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966); Burns v. United States, 286 F.2d 152 (10th Cir. 1961). Furthermore the Jolkovsky transactions involved four purchases over a period of time.

### III.

Lowther and Lowry allege that a severance should have been granted because evidence and testimony during the trial admissible as to one defendant was not always admissible as to the other defendants and because insufficient cautionary instructions were given by the trial judge. Rule 14, Fed.R.Crim.P. requires that if a defendant is prejudiced by a joinder the court may order separate trials. In oral argument the appellants' attorneys brought out that Lowry and Lowther's names were confused 58 times during the trial. From our examination of the record we found that their names were mixed up approximately 23 times. In almost every instance the confusion was immediately noted and clarified by the Court. The motion to sever was properly denied by the trial court.

■ Lowry and Lowther were shown to be participants in a scheme to defraud purchasers of Elkton stock. The Court carefully protected each appellant by instructions limiting the jury from considering evidence against any defendant not shown to have been tried thereto. The trial judge stated during his closing instructions:

"The acts, omissions, declarations, or statements of any one defendant are not to be considered by you as the acts, omissions, declarations, or statements of any other defendant, unless and until you are satisfied beyond a reasonable doubt that such defendant has

entered into the unlawful scheme to defraud, as alleged in the Indictment, and that he was an active, knowing, and willful participate (sic) in such scheme at the time that the act, omission, declaration, or statement was made, and that the act, omission, declaration, or statement was made to bring about the criminal objective of the scheme."

This court has held that it is within the discretion of the trial court to grant separate trials and unless a clear abuse of discretion is shown, his ruling will be upheld on appeal. United States v. Kellerman, 432 F.2d 371 (10th Cir. 1970); McGee v. United States, 402 F.2d 434 (10th Cir. 1968), cert. denied 394 U.S. 908, 89 S.Ct. 1020, 22 L.Ed.2d 220 (1969); Baker v. United States, 329 F.2d 786 (10th Cir. 1964), cert. denied 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964). A severance may be granted only where the defendant has shown that he would clearly be prejudiced by a joint trial. There was substantial evidence that Lowry and Lowther participated in the same scheme to defraud justifying a joint trial under Rule 8, Fed.R.Crim.P. The appellants have failed to show sufficient prejudice to warrant a severance. The trial court did not abuse its discretion by not granting separate trials.

### IV.

Both Lowry and Lowther contend that the trial court failed to marshal the evidence in such a way as to inform the jury of the proof against each defendant. They allege that the Court's instructions allowed the jury to consider evidence against all defendants when it should have been excluded as to one or more of them.

▮▮▮ The Court gave the following instructions during his closing remarks to the jury:

"Each offense, and the evidence applicable thereto, should be considered by you separately as to each defendant, and as to each Count.

The fact that you may find a defendant guilty or not guilty as to one Count, should not control your verdict with respect to the guilt or innocence of that defendant, of the other Counts. The guilt or innocence of any one defendant of any Count should not influence your verdict respecting the other defendants.

Each defendant is entitled to have the Charges against him considered separately in the determination of his guilt or innocence, as to any or all of the offenses charged against him.

You will recall that during the course of the trial the Court instructed you as the evidence came before the Court and the jury that certain of that evidence could be considered by you only as to a certain defendant or defendants unless and until the Court instructed you to the contrary. The Court now instructs you as follows:

The acts, omissions, declarations or statements of any one defendant are not to be considered by you as the acts, omissions, declarations, or statements of any other defendant unless and until you are satisfied beyond a reasonable doubt that such defendant has entered into the unlawful scheme to defraud, as alleged in the Indictment and that he was active, knowing, and a willful participant in such scheme at the time that the act, omission, declaration or statement was made, and that the act, omissions, declaration or statement was made to bring about the criminal objective of the scheme.

If you find from the evidence beyond a reasonale doubt that a defendant· entered into the alleged unlawful scheme with one or more of the other defendants and knowingly and willfully participated therein with another defendant or defendants for the purpose of bringing about the criminal objective of such scheme, then in that event you may consider as to those participating defendants all of the acts, omissions, declarations or statements made by any and all of such participants in the unlawful scheme."

The instructions were proper. They restricted the use of evidence against all of the defendants from consideration until a scheme was found to exist beyond a reasonable doubt. It is within the trial court's discretion to state the facts in his closing charge and to comment on the evidence. Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841 (1894); Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); United States v. Tourine, 428 F.2d 865 (2nd Cir. 1970), cert. denied 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). There was no abuse of discretion here when the Court decided not to comment on the evidence as it pertained to each defendant. There was a lengthy trial. It involved a great deal of evidence. The jury's individualized verdicts demonstrated that it had no difficulty following the Court's instructions on an individualized basis as to each defendant. The Court was careful to adequately safeguard each defendant against the possibility that evidence applicable to one defendant would be used to convict another defendant.

The appellants also contend that certain requested instructions were not given by the Court although no objections were made during the trial. It is a general rule that appellate courts will not consider instructions to which no objections or exceptions were made, except that the court has the inherent power to inquire into the adequacy of a charge in cases where there is grave error which amounts to a denial of a fundamental right of the accused. Fischer v. United States, 212 F.2d 441 (10th Cir. 1954); Madsen v. United States, 165 F.2d 507 (10th Cir. 1947). No such fundamental right was denied here. The Court adequately covered the requested instructions during the trial and by the instructions given in his closing remarks. Troutman v. United States, 100 F.2d 628 (10th Cir. 1938); Tingley v. United States, 34 F.2d 1 (10th Cir. 1929); Luke v. United States, 84 F.2d 823 (5th Cir. 1936). The purpose for which evidence is admitted may be limited either at the time it is received or in the general instructions. Troutman v. United States, *supra*. Since the Court properly marshalled the evidence at the time it was received there was no need to limit it through a general instruction at the end of the trial.

### V.

Lowry and Lowther allege that certain exhibits should not have been admitted into evidence because they only pertained to one of the defendants and they were hearsay as to the other. There is no need to discuss the admissibility of certain exhibits in detail because the Court correctly handled the admission of exhibits which applied to less than all of the appellants by instructing the jury that they were to be considered only as to the particular defendant connected with it. Beckwith v. United States, 367 F.2d 458 (10th Cir. 1966). At the conclusion of the trial the Court properly instructed the jury that if a common scheme was found to exist, evidence against one appellant could be considered against the others. The general rule is that where two or more people have schemed to commit a criminal offense, everything done or said by one of them during the scheme may be admitted in evidence against the others. Beckwith v. United States, *supra;* Glover v. United States, 306 F.2d 594 (10th Cir. 1962); Beck v. United States, 305 F.2d 595 (10th Cir. 1962), cert. denied 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962). The Court did not abuse its discretion by admitting the exhibits.

### VI.

Lowther moved twice during the trial for a mistrial. He sought a mistrial after the testimony of a Government witness disclosed that short checks had been presented by him. Lowther alleges that evidence must tend to prove a matter in issue and cites Bowman v. United States, 50 App.D.C. 90, 267 F. 648 (1920). He also cites Melton v. United States, 398 F.2d 321 (10th Cir. 1968) for the proposition that evidence of

unrelated offenses is inadmissible. Although *Melton* and *Bowman* are properly cited by Lowther, his contention has no merit. The evidence introduced would not have aroused the suspicion of other criminal conduct by Lowther in the minds of the jury.

Lowther and Lowry each moved for a mistrial on the basis of an exchange between Lowry's counsel and the Court concerning the signing of minutes. Lowry's attorney told the Court in the presence of the jury that it is a well established practice that directors sign minutes; the Court interrupted and stated that it did not ask for "contemptuous conduct" by counsel. The appellants contend that this amounted to prejudicial conduct on the part of the Court and prevented them from obtaining a fair trial. However, the trial court acted properly in ordering counsel not to comment on what was not then in evidence. The Court has the power to direct the trial along recognized lines of procedure in a manner reasonably thought to bring about a just result. Non-prejudicial comments may be made by the Court from time to time. Cooper v. United States, 403 F.2d 71 (10th Cir. 1968); Inland Freight Lines v. United States, 191 F.2d 313 (10th Cir. 1951); Posey v. United States, 416 F.2d 545 (5th Cir. 1969), cert. denied, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970).

In Whitlock v. United States, 429 F.2d 942 (10th Cir. 1970) counsel was threatened with contempt by the Court during the trial and the appellant contended that this denied him a fair trial. The Court held that although counsel was caused some disappointment and perhaps discomfort, this could not be said to have interfered with the fairness of the trial. That would appear to be the situation here. Counsel argued with the Court about a point and the Court ordered him not to discuss it any further at that time. Although Lowry's counsel was perhaps embarrassed in the presence of the jury this cannot be said to amount to such prejudice as to have resulted in an unfair trial.

## VII.

Lowther alleges that thirteen proposed voir dire questions were not asked the jury and that all of them pertained to the state of mind of the jurors which would result in prejudice to one or more defendants. He alleges that the Court's discretion in asking questions should be subject to essential demands of fairness. This court recognizes that the trial court has broad discretion on questions to be asked on voir dire. Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); United States v. Brewer, 427 F.2d 409 (10th Cir. 1970); United States v. Williams, 417 F.2d 630 (10th Cir. 1969); Kreuter v. United States, 376 F.2d 654 (10th Cir. 1967), cert. denied 390 U.S. 1015, 88 S.Ct. 1267, 20 L.Ed.2d 165 (1968). The trial court's discretion will not be disturbed on appeal unless voir dire was inadequate to test the qualifications and competency of the jurors. Kreuter v. United States, *supra;* Brundage v. United States, 365 F.2d 616 (10th Cir. 1966); Speak v. United States, 161 F.2d 562 (10th Cir. 1947). After a thorough examination of the record we are convinced that there was no abuse of discretion by the trial court in not asking the proffered voir dire questions.

## VIII.

Lowther argues that certain portions of the Indictment should have been stricken because they had no testimonial relation to the case and that it was error to send the Indictments to the jury room. The failure to strike certain portions of the Indictment was not prejudicial because of the Court's instructions that the Indictment was not evidence; that guilt or innocence was to be determined on the evidence; that the Government was not required to prove each aspect of the Indictment; and that a conviction could not be upheld on suspicion or conjecture. United States v. Warner, 428 F.2d 730 (8th Cir. 1970), cert. denied 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970); United States v. Marquez, 424 F.2d 236 (2nd Cir. 1970), cert. denied 400 U.S. 828, 91 S.Ct. 56, 27

L.Ed.2d 58 (1970); United States v. Rice, 428 F.2d 923 (5th Cir. 1970).

We have studied this voluminous record with care. We find that the trial court conducted a difficult case with extreme care in order to protect all of the rights of those accused. There is substantial evidence to support the jury's conclusion of guilt on Count one.

We affirm.