**UNITED STATES of America**

v.

**James TURNER, a/k/a Brother Turner, Appellant.**

**No. 24914.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1972.

Decided July 25, 1973.

Rehearing Denied Aug. 30, 1973.

S. White Rhyne, Jr., Washington, D. C. (appointed by this Court), for appellant.

Robert Alan Jones, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Herbert B. Hoffman, Asst. U. S. Attys., were on the brief, for appellee. Thomas A. Flannery, U. S. Atty., at the time the record was filed and Robert S. Tignor, Asst. U. S. Atty., entered appearances for appellee.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge, and HARRISON L. WINTER,* Circuit Judge for the Fourth Circuit.

PER CURIAM:

Judge Winter files an opinion in Parts I, II, III B and IV of which Chief Judge Bazelon and Judge Leventhal concur. Judge Leventhal files an opinion in which Chief Judge Bazelon concurs, Judge Winter concurring separately for the reasons stated in Part III A of his opinion. Thus, Parts I, II, III B and IV of Judge Winter's opinion and Judge Leventhal's opinion together constitute the opinion of the court. The judgment is affirmed.

So ordered.

WINTER, Circuit Judge:

Conviction in a jury trial of facilitating the concealment and sale of heroin in violation of 21 U.S.C. § 174 * * and sentenced to five years imprisonment, James Turner appeals. In the same trial, Turner was found not guilty of the sale of heroin in violation of 26 U.S.C. § 4705(a) (without a written order on an official form), and not guilty of the sale of heroin in violation of 26 U.S.C. § 4704(a) (other than from the original stamped package).

Turner attacks the validity of his conviction on four grounds. He contends that: (1) the evidence was legally insufficient to convict him, (2) evidence that he was unemployed but had $3,000

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1970).

** 21 U.S.C. § 174 was repealed by Pub.L. 91–513, 84 Stat. 1291, effective October 27, 1970. Section 1103 of Pub.L. 91–513 preserved prosecutions for violations occurring before its effective date. Defendant's violation was alleged to have occurred on or about July 9, 1969.

in cash on his person when arrested was improperly admitted against him, (3) evidence that he attempted to bribe a crucial government witness was improperly admitted against him and the error was compounded by improper instructions to the jury with regard to the consideration it might give to this evidence, and (4) his acquittals on the two charges of sale of heroin, respectively, were so inconsistent with the verdict of guilty on the charge of facilitating the concealment and sale of heroin that a judgment of acquittal was required to be entered on the latter.

We find no merit in any contention and affirm the judgment.

## I.

To pass upon the claim of insufficiency of the evidence and to provide the context of Turner's other contentions, it is necessary to recite some of the government's proof.

The government's principal witness, Mrs. Estelle Tompkins, was a former drug addict who had been a paid informer employed by the Bureau of Narcotics and Dangerous Drugs since 1960. On July 2, 1969, she was in the apartment of Miss Gladys Irby, at 744 Girard Street, N.W. Miss Irby, whom Mrs. Tompkins had known for about twelve years, was present, as was the defendant whom Mrs. Tompkins had known for twenty or twenty-one years, and two other persons whose identity was unknown to Mrs. Tompkins. At that time, defendant requested Mrs. Tompkins to go to New York to bring back some cutting materials for diluting narcotic drugs and a box of gelatin capsules. Miss Irby gave Mrs. Tompkins $150 to facilitate the transaction. After full consultation with representatives of the Bureau, Mrs. Tompkins performed the mission and, on July 4, at 4:30 a. m., she took a package containing these items to Miss Irby's apartment and left it with her.

On July 5, Mrs. Tompkins went back to the apartment and purchased two tablespoons of suspected narcotics for $50. After she left the apartment, Mrs. Tompkins told the agents of the Bureau that the package of cutting materials and capsules was still at the apartment and that defendant would be there to pick it up at approximately 2:00 p. m.

Agents of the Bureau set up a surveillance on the apartment, and at about 2:15 p. m. defendant entered and left shortly thereafter carrying a brown package similar to the one which Mrs. Tompkins had brought and left there the preceding day.

Three days later, on July 8, Mrs. Tompkins telephoned Miss Irby and tried unsuccessfully to arrange a purchase of an ounce of "pure" heroin, i. e. heroin purer than customary "street strength," but not necessarily totally undiluted. With Mrs. Tompkins' permission, the call was monitored by an agent of the Bureau. The next morning, at 5:30 a. m., Miss Irby returned the call and told Mrs. Tompkins that the deal could be made for $1,000, but that Miss Irby would have to get the heroin from defendant because she did not have uncut heroin herself.

At about 2:20 p. m. that day, Mrs. Tompkins received a telephone call which was monitored by an agent of the Bureau. The caller was a male who asked "Estelle" what she wanted. When Mrs. Tompkins replied that she wanted an ounce of pure heroin, the male caller replied, "Okay, I will get it ready for you." He said that he was at Miss Irby's apartment and asked Mrs. Tompkins how long it would take her to get there. She said that it would take about twenty minutes. He then instructed her to call when she got in the neighborhood so that he could come and open the door to the premises which had a security lock on it. Mrs. Tompkins unequivocally identified defendant as the caller. Besides knowing him for approximately twenty years, she had visited his home and socialized with him frequently and spoken with him over the telephone on numerous occasions.

Mrs. Tompkins and the agent of the Bureau who accompanied her did not go to pick up the heroin immediately because they lacked sufficient funds to effect the purchase; but after they obtained the money, the two of them went to Miss Irby's apartment shortly after 4:00 p. m. Mrs. Tompkins entered and she received eight or nine spoonsful of white powder from a plastic bag into a glassine envelope. Defendant was not present and there were no tax stamps on the package or anywhere else on the premises. Mrs. Tompkins did not have a written order form for the drugs and Miss Irby did not request one. The powder was later shown by chemical analysis to be a mixture containing twenty-two percent heroin.

Mrs. Tompkins saw defendant several times in April 1970, after he had been accused of the instant offense. She was permitted to testify that defendant told her he would give her part or all of the $3,000 taken from him at the time of his arrest in exchange for her testimony that it was not he who spoke with her on the telephone on July 9, 1969. This testimony was received over defendant's objection. When the jury was about to be charged, defendant objected to the giving of any instruction relating to this testimony. The district court, however, instructed the jury that it might consider the testimony "not [as] evidence of guilt with respect to the offense or offenses with which the defendant is charged in this case . . . [but] as tending to prove the defendant's consciousness of guilt or as relevant to the intent, or the absence of mistake, or as tending to establish the identity of the persons charged with the commission of the crime." Defendant lodged no exception to the charge.

## II.

The principal thrust of defendant's contention that the evidence was legally insufficient to permit the jury to find him guilty beyond a reasonable doubt is directed to the identification testimony of Mrs. Tompkins. Defendant concedes

that "[i]f defendant was in fact the person who placed the call to Mrs. Tompkins at 2:00 p. m. on July 9, there could be little doubt of his guilt." The uncertainty of the accuracy of the identification of a voice on the telephone, inconsistencies in her other testimony, and her possible bias are all stressed to support the overall conclusion that there was lacking the degree of certainty in the proof which would enable a jury to make the requisite finding ultimately resulting in defendant's loss of his liberty.

■ As a general rule, federal courts have permitted evidence of identification of a voice on the telephone where a basis on which to make a reasonably accurate identification has been shown. Noriega v. United States, 437 F.2d 435 (9th Cir.), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971); United States v. Turner, 423 F.2d 481 (7th Cir.), cert. denied, 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed.2d 552 (1970); United States v. Valdes, 417 F.2d 335 (2d Cir.), cert. denied, 399 U.S. 912, 90 S.Ct. 2206, 26 L.Ed.2d 566 (1969); Palos v. United States, 416 F.2d 438 (5th Cir.), cert. denied, 397 U.S. 980, 90 S.Ct. 1107, 25 L. Ed.2d 391 (1969); Hale v. United States, 410 F.2d 147 (5th Cir. 1969); United States v. Cooper, 365 F.2d 246 (6th Cir.), cert. denied, 385 U.S. 1030, 87 S.Ct. 760, 17 L.Ed.2d 677 (1966); Michaud v. United States, 350 F.2d 131 (10th Cir. 1965); Espinoza v. United States, 317 F.2d 275 (9th Cir. 1963); Carbo v. United States, 314 F.2d 718 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); Davis v. United States, 279 F. 2d 576 (4th Cir. 1960).

■ We think the rule should be applied here. Mrs. Tompkins was shown to have known defendant for approximately twenty years, to have known him well, and to have talked with him on the telephone numerous times. There was ample basis to admit her identification testimony. The possible deficiencies in her testimony—mistake, impeachment by other discrepancies and bias—were

not so great as to render it inadmissible. Indeed, these were counterbalanced by other corroborating factors: (1) defendant was shown to have visited the premises where the illegal sale of heroin was made; (2) defendant employed Mrs. Tompkins to obtain cutting materials for narcotics only seven days before the offense in the instant case; (3) defendant was seen entering and leaving the premises only four days prior to the offense, apparently carrying out the cutting materials which Mrs. Tompkins had procured; (4) the male caller on July 9 knew and used Mrs. Tompkins' first name, "Estelle," in the conversation; and (5) as we will hereafter discuss, defendant admitted his identity as the caller. Any deficiencies in Mrs. Tompkins' testimony went to its weight and were matters for the consideration of the jury, but we cannot conclude that the jury should not have heard her identification of the defendant.

### III.

A. Because they are closely related, I would treat together defendant's contentions of error in the admission of evidence that he was unemployed, that he had $3,000 in cash on his person when arrested, that he sought to bribe Mrs. Tompkins, and that the district court improperly instructed the jury with respect to the bribe attempt. Defendant's principal argument is that this evidence collectively amounted to evidence of the commission of crimes other than those with which defendant was accused in the instant case, that such evidence of other crimes was inadmissible, and that admission of the evidence, over defendant's objection, constituted reversible error. Defendant stresses the differences between this case and United States v. Washington, 150 U.S.App.D.C. 68, 463 F.2d 904 (1972), in which, in the absence of objection, the court held it not plain error to cross-examine a defendant about $735 in cash on his person when arrested where he had testified in his own behalf and denied that he used or sold narcotic drugs. The decision there

was predicated upon the fact that at trial defendant had not objected to the later challenged cross-examination and that he had opened the door to it by his testimony in his own behalf. The court further recognized, with respect to the latter, that had defendant objected to the cross-examination the "question might have been close" as to whether the cross-examination would have been proper, but it concluded that the failure to object was fatal to the contention on appeal.

The district court admitted the challenged evidence and instructed the jury to consider it, solely on the theory that it fell within one of the exceptions to the general rule that "evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged, "i. e., that it was relevant to (1) motive, (2) intent, (3) absence of mistake or accident, and (4) identity. Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85, 89–90 (1964). In this I perceive no error, because on the record, as the case comes to us, I think the evidence was admissible collectively to prove an admission of guilt on the part of the defendant. Hence, even if defendant's failure to object to the instruction which was given is ignored, I would conclude that the defendant received more benefit from the district court's instruction to the jury than he was entitled to claim.

I reach these conclusions by this route: The principal factual question in the case was the identity of the male caller who spoke with Mrs. Tompkins on the telephone on July 9, 1969. While the record shows that Mrs. Tompkins and the defendant had several conversations after the defendant was formally accused and arrested, the record is silent as to whether they ever discussed what testimony Mrs. Tompkins was prepared to give at the trial. Defendant did not testify and Mrs. Tompkins was not questioned about the substance of these conversations. *The record thus fails to establish that defendant was told by Mrs.*

Tompkins, or learned from any other source, that Mrs. Tompkins was prepared to identify defendant as the caller. If Mrs. Tompkins' testimony that defendant offered to give her all or a part of the $3,000 that the government had confiscated from him at the time of his arrest in exchange for testimony that "it wasn't him on the 'phone' " is believed, it follows that the jury should have been permitted to conclude that defendant impliedly admitted that he was the caller, because he could not have had that knowledge if he was innocent. Since his admission included disclosure that he had $3,000 on his person when arrested, admission of that evidence was not error; and admission of evidence that he was not known to be gainfully employed was relevant to show why the tendered bribe money would be required to be gotten from that seized from him rather than from other funds. Thus, the case is not like one where there is evidence of flight during or after arrest, and where it can be said that such evidence has only limited probative value because an innocent man may choose to flee because of fright, as well as a guilty man because of knowledge of guilt. Here, it would have been proper to conclude that defendant would have attempted to bribe Mrs. Tompkins only because he was conscious of his guilt and thus knew that she was in a position to identify him.

As Judge Leventhal's opinion stresses, my conclusion is premised on the lack of evidence to show that defendant innocently learned the substance of Mrs. Tompkins' testimony. I do not think it improper to rely on this negative fact. At the outset, I put aside any notion that as a reviewing court we should be absolutely bound by the theories of counsel or the trial court under which alleged error in the admissibility of evidence is to be judged. Our function is to determine if there was error and if the rights of the defendant were prejudiced; not to determine if the theories of counsel and the trial judge were cor-

rect irrespective of the result which was reached.

The motion for particulars, which was not formally answered can hardly be read to elicit information about the substance of Mrs. Tompkins' testimony, and the motion for suppression, at most, discloses peripheral knowledge of the fact of the conversation but not the source of such knowledge. Of course Mrs. Tompkins' testimony *may* have been disclosed and explored at the omnibus hearing held March 25, 1970, but it is significant that despite pointed questioning in oral argument before us, neither defendant's counsel nor counsel for the government could suggest any source of defendant's knowledge consistent with his innocence. True, both were other than the attorneys who represented the parties at trial, but I do not think it unreasonable to assume that their knowledge of the case extended beyond the bare transcript of trial.

What is perhaps more significant is that Judge Leventhal's theory of admissibility of the evidence as proving "consciousness of guilt" disguises but does not avoid that with which I think we should openly grapple. The persuasiveness of an attempted bribe as evidence of "consciousness of guilt" depends in most part on whether defendant innocently knew of the need for a bribe or whether his knowledge was guilty knowledge. Thus, even under this restricted theory of admissibility, defendant's trial counsel was put on notice of the need to dilute the implication of "consciousness of guilt" by any evidence available to accomplish that purpose. Absent such evidence, I am firm in my conclusion that the record's silence on the crucial factor of how defendant may have innocently obtained knowledge of Mrs. Tompkins' testimony should permit us to treat the evidence of the bribe as an admission by conduct.

█ B. A further word is required with regard to the evidence that defendant had $3,000 on his person when arrested. At trial, the government's theo-

ry of its admissibility was that, in addition to corroborating the testimony of Mrs. Tompkins, such evidence proved defendant's financial ability to traffic in large quantities of narcotics. Admission of the evidence to show defendant's financial ability to commit the specific crime charged, I agree, was proper. However, at the close of the evidence, the government asserted that it would argue that the fact that defendant had such a large sum on him at 4:00 a. m. was material evidence that he was engaged in the commission of such crimes. Over defendant's objection, the district court agreed that he could so argue. The prosecutor's actual argument on the subject consisted of only two rhetorical questions: "Who was the man who when he was arrested had $3,000 on him at 4 o'clock in the morning? Who carries $3,000 on him on the day, if they are not trafficking in narcotics?"

The district court's ruling that the evidence was admissible and argument proper to prove defendant's financial ability to commit other crimes was error, because, absent special circumstances not present here, "evidence of other crimes is not admissible as direct evidence of guilt . . . ." United States v. Washington, 463 F.2d 906. Although perilously close to reversible error, the prosecutors' argument was oblique in its reference to other crimes and the references uttered were an insignificant part of an extended argument. I therefore see no reversible error, but I think that in future cases the government should limit its proof and argument to those showing that the defendant had the means to commit the crime charged and should assiduously avoid any shred of implication that the government asserts that a defendant engages in such transactions generally.

## IV.

Defendant's contention that his acquittals on the two charges of sale of heroin foreclosed his conviction of facilitating the concealment and sale of heroin is grounded upon Ashe v. Swenson,

397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). That case held that the double jeopardy clause prevented a defendant from being subjected to successive prosecutions for robbing six participants in a poker game where, under the evidence, the only disputed issue of fact was the identity of the robber, and defendant was found not guilty when he was tried for robbing the first victim. The rationale of Ashe was that, under the facts of that case, the first acquittal constituted an adjudication that defendant was not the robber and the guarantee against double jeopardy prohibited relitigation of that issue. Although Ashe was concerned with multiple prosecutions, it has been suggested by Chief Judge Bazelon, concurring specially, that its doctrine may be equally applicable to multi-count indictments. United States v. Fox, 140 U.S.App.D.C. 129, 433 F.2d 1235, 1239 (1970).

Aside from the question of whether Ashe applies to verdicts on multi-count indictments, it is inapposite here. In the first and second counts of the indictment returned against him, defendant was charged with the *sale* of narcotic drugs without a written order of the person to whom the drugs were sold on a form issued in blank by the Secretary of the Treasury, and not in the original stamped package, respectively. By contrast, in the third count, defendant was charged with *facilitating* the concealment and sale of narcotic drugs, in violation of 21 U.S.C. § 174.

At trial, the government offered no direct evidence of a sale by defendant to Mrs. Tompkins. Defendant was not present when the transaction occurred in Miss Irby's apartment, and there was no evidence to show that defendant was in actual physical possession of the heroin at any time. Thus, the jury could quite reasonably have concluded that defendant's sole connection with the heroin that Mrs. Tompkins obtained from Miss Irby was the telephone call which he made on July 9 to facilitate the sale. While the jury may have inferred from the evidence that defendant had either

made a sale to Miss Irby, or that Miss Irby acted as his agent in making a sale to Mrs. Tompkins, in the absence of testimony of a personal transaction between Mrs. Tompkins and defendant, the jury quite properly may not have been satisfied beyond a reasonable doubt that defendant did more than facilitate a sale made by Miss Irby acting in her own behalf. Thus, we see no inconsistencies in the jury's several verdicts, since defendant's acquittal on the charges of sales of heroin did not necessarily adjudicate that he did not facilitate a sale or concealment by someone else. These acquittals are no bar to his conviction on the third count.

For all of these reasons, the judgment of the district court is

Affirmed.

LEVENTHAL, Circuit Judge:

■ The majority of the court has decided that the court should consider the propriety of the trial judge's instruction on the "bribe" issue, and should uphold that instruction.

1. The prosecutor elicited from Mrs. Tompkins, the principal Government witness and alleged purchaser of the narcotics, that she had conversations with the defendant concerning this case, about going to see his lawyer, and one in which he purportedly offered $3,000 in exchange for her testimony "that it wasn't him on the 'phone.' " At a bench conference, defense counsel asked that the testimony be stricken as immaterial and unduly prejudicial, and he moved for a mistrial. The prosecutor was asked for authority and cited Bowman v. United States, 50 App.D.C. 90, 267 F. 648 (1920), where intimidation of a witness, in order to suppress testimony, was held admissible at trial as "evidence of consciousness of guilt." The trial court then denied the defense motions and admitted Mrs. Tompkins' testimony. (Tr. I: 38–39).

Subsequently, the issue resurfaced in connection with the prosecutor's request for an instruction that the evidence of the bribe offer, if credited, "may show consciousness of guilt, but they [the jury] are not required to make that inference." Defense counsel objected. The judge said he would not give that instruction · and accordingly precluded the Government from presenting argument to that effect to the jury (Tr. I: 241–242). During the summations which followed, neither counsel referred to the bribe offer.

However, the bribe offer was ultimately made the subject of an instruction somewhat different from that requested by the prosecutor. The judge referred to *Bowman* and explained his thinking thus (Tr. I: 243–244):

THE COURT: The question on which it turns it seems to the Court is whether sufficient evidence tends to be more probative than prejudicial. I think it is a fairly close question. I think bribery is as serious as a threat to kill. It goes to the vitals of the administration of justice. But it throws some light on the intention of the defendant with respect to these crimes. Justice Charles Robb said in this Bowman opinion, if the jury believes that the defendant threatened the life of Esther Brown as testified by her, the testimony of the assault made in pursuance of those threats had a legitimate bearing on the question at issue, the intent of the defendant in committing the act charged, for there would have been no occasion for an innocent man to resort to such threats and assault. It is that latter language which gives me some hesitancy for this reason: Conceivably an innocent man could take the position that the charge against him was so serious as he would do anything, even bribe a witness.

The instruction given by the judge, quoted in the footnote margin,[1] advised

---

1. Now, ladies and gentlemen, you may recall there was some evidence in this

case tending to indicate that the defendant offered the complaining witness a

the jury: (1) The bribe offer "is not evidence of guilt" of the offense, nor does it create a presumption of guilt. (2) Some innocent people charged with serious offenses may resort to unlawful as well as lawful means to insulate themselves against successful prosecution. (3) However, the evidence, if credited, may be considered along with all other evidence, "as tending to prove the defendant's consciousness of guilt or as relevant to intent or the absence of mistake or as tending to establish the identity of the person charged with commission of the crime."

Judge Winter's opinion seeks to avoid the issue of whether the bribe offer could be admitted as evidence of "general consciousness of guilt" by saying that the instruction gave the defendant more than he was entitled to, since the evidence tended directly to prove identity, in that his knowledge at the time of the bribe offer that the witness would testify to a telephone conversation with him meant he must have engaged in that conversation. But on December 24, 1969, prior to the time of the alleged bribe (April, 1970), defendant had filed a motion for a bill of particulars requesting, among other things, "the name of the person to whom the narcotics were allegedly transferred," and also a motion for a pretrial hearing on the admissibility of telephone conversations, which stated the defense expected "that the unnamed purchaser will testify as to certain telephone conversations allegedly between herself and one Gladys Irby as well as the defendant; also that Agent Wilder overheard the said alleged telephone conversations." This motion, filed by an experienced defense counsel, may well have, indeed probably,[2] reflected his 1969 conversations with the prosecutor or with Mrs. Tompkins herself. In any event, on March 25, 1970, there was an "omnibus hearing" before Judge Gasch on pending motions. The docket sheet contains no entries reflecting any action on the defense motions, but it is entirely possible that Mrs. Tompkins' expected testimony of the telephone conversation was fully explored at the omnibus hearing. It was not until after this hearing that the April, 1970, offer of a bribe was alleged to have been made.

It would be speculation for this court to posit that defendant's knowledge that Mrs. Tompkins would testify to an alleged telephone conversation tended to show that he had engaged in the conversation. No such suggestion was put forward at trial by the prosecutor, who was obviously interested in admission of the bribe offer and had prepared himself to argue for its admission as evidence of "general consciousness of guilt." Experienced defense counsel put forward a reference to the telphone conversation in the motion filed in 1969, without being concerned that this was an admission of guilty knowledge. This was not the basis put forward for receipt of the evidence by the experienced trial judge, a former United States Attorney, who had also presided over the omnibus hearing.

3. Facing up to the situation as it developed at the trial, to consider whether error was committed, the court's in-

considerable sum of money if she would change her expected testimony to reflect that she was unable to identify his voice over the telephone. This evidence, if the jury believes it, is not evidence of guilt with respect to the offense or offenses with which the defendant is charged in this case, nor does it create a presumption of guilt. Some innocent people charged with serious offenses may resort to various means both lawful and unlawful calculated to insulate them against successful prosecution. You may consider this evidence, however, if you believe it, as tending to prove the defendant's consciousness of guilt or as relevant to intent or the absence of mistake or as tending to establish the identity of the person charged with the commission of the crime. If any of these circumstances seem relevant to you, you may consider this evidence, if you believe it, along with all of the other evidence in the case and give it such weight as in your judgment it is entitled to receive. (Tr. II: 39–40).

2. How otherwise account for the reference to Agent Wilder?

quiry properly begins by noting that it seems to be generally accepted doctrine that a party's "misconduct constituting obstruction of justice" prior to trial is "commonly regarded as an admission by conduct. By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means." McCormick on Evidence § 273, at 660 (2d ed., 1972). That seems to be the widely accepted rule, as evidenced by decisions of other courts.[3] It is supported in the jurisprudence of this court by the 1920 *Bowman* opinion of Justice Charles Robb.

Professor McCormick's treatise raises a question about this rule and its assumptions, while conceding that such evidence is generally admitted.[4] The question is a good one, and the trial judge also identified it, saying that bribery might be consistent with innocence, coupled with a strong desire to resist prosecution for a serious offense. But on balance, and considering the relative probative force and prejudice, he believed that the evidence of the bribe offer should be admitted. He undertook to limit any unfair inference by instructing the jury that this might have been done by an innocent man, that it was not direct evidence of the offense, and that it was only a circumstance to be considered. Defense counsel acquiesced in the form of that instruction (Tr. II: 2), although appellate counsel

now objects that it was confusing and contradictory.

This is not a case where the appellate court should upset the trial court's exercise of discretion. Such matters as bribery, intimidation, and spoliation of documents stand on a different level, as indicators of guilt, from, for example, flight. While bribery is consistent with innocence, it seems probable, as a fact of life, that a very high percentage of men who offer to bribe witnesses are in fact responding to a general consciousness of guilt.

Perhaps one point that merits further discussion is this: The bribe offer is said to be admissible as broad corroboration. But in this case it depended on crediting the testimony of the same witness who made the critical identification. On the other hand, the jury may well have thought her a truthful witness who might have been mistaken, though not dishonest, if they knew only of her voice identification over the telephone. But the unlikelihood of "mistake" about identifying a person making a bribe offer in a face-to-face confrontation, on an assumption of demeanor—veracity, permit not only an inference of defendant's general "consciousness of guilt," but also, in the alchemy of the juryroom, operate to confirm the strength of her original observation, and remove any residual doubts, in view of her tenacity in persisting in the testimony notwithstanding the proferred bribe.

3. *See, e. g.,* Justice Ervin's opinion in State v. Minton, 234 N.C. 716, 68 S.E.2d 844, 849 (1952), using language much like that quoted from McCormick:

An attempt by an accused to induce a witness to testify falsely in his favor may be shown against him. Such conduct indicates a consciousness on his part that his cause cannot rest on its merits, and is in the nature of an admission that he is wrong in his contention before the court. (citing cases and texts)

See also State v. Rolfe, 92 Idaho 467, 444 P.2d 428, 431 (1968); People v. Gambony, 402 Ill. 74, 83 N.E.2d 321, 325 (1949); State v. Smith, 355 Mo. 59, 194

S.W.2d 905, 907 (1946); 2 Wigmore on Evidence, § 278 (1940 ed. at 123 and cases collected 1972 Supp. at 41).

4. A question may well be raised whether the relatively modest probative value of this species of evidence is not often outweighed by its prejudicial aspects. The litigant who would not like to have a stronger case must indeed be a rarity. It may well be that the real underpinning of the rule of admissibility is a desire to impose swift punishment, with a certain poetic justice, rather than concern over niceties of proof. In any event, the evidence is generally admitted. McCormick, *supra* at 661 (footnotes omitted).

In this context, the instruction of the trial judge, while not ideal, was a reasonable exercise of discretion, to admit probative evidence and yet contain any undue prejudicial effect. What the judge did was to adapt the flight instruction of Austin v. United States [5] to a bribery situation. This was reasonable. Where, as here, the post-accusation conduct of the defendant sought to be put before the jury is itself unlawful, the need of a cautionary instruction is even more pronounced than in the case of flight,[6] which, though it has less probative force, does not generally constitute a criminal offense.

---

5. 134 U.S.App.D.C. 259, 414 F.2d 1155 (1969).

6. *Cf.* United States v. Robinson, 154 U.S. App.D.C. 265, 475 F.2d 376, at 384 (1973); United States v. Telfaire, 152 U.S.App.D.C. 147, 151, 469 F.2d 552, 557–558 (1972).