**UNITED STATES of America**

v.

**David SHELTON, Appellant.**

**No. 79–1026.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 5, 1979.

Decided Feb. 15, 1980.

Richard S. Stern, Washington, D. C. (appointed by this Court), for appellant.

Norman M. Monhait, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert,* U. S. Atty., John A. Terry, Peter E. George and Paul N. Murphy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and PARKER,** United States District Judge for the District of Columbia.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

David Shelton appeals from a jury verdict finding him guilty of assaulting a federal officer.[1] He argues that the district court erred in permitting the prosecutor to conduct a line of cross-examination which

---

* United States Attorney at the time the brief was filed.

** Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 18 U.S.C. §§ 111, 1114 (1976).

he contends was both improper and prejudicial. We agree. Therefore, we reverse.

## I

Appellant was indicted and charged with one count of assault on a federal officer,[2] one count of using a firearm while committing a felony,[3] and one count of carrying a pistol without a license.[4] After a jury trial, the court dismissed the two firearms counts. However, the jury found Shelton guilty of assault on a federal officer.

The primary witness for the prosecution was detective Michael Hubbard of the Metropolitan Police Force, a member of a joint narcotics task force run by the Drug Enforcement Administration.[5] He testified that on the afternoon of May 24, 1978, he received a tip from a previously reliable informant that led him to look for a blue Pinto with specified tag numbers in the vicinity of 14th and T Streets, N.W. He spotted the car and followed it until it pulled to the curb a few blocks away. Hubbard approached the car, identified himself, and asked for the driver's license and registration. Neither the driver nor his two passengers, one of whom was the appellant, could produce these documents. The officer took the Pinto's ignition key and returned to his car to call headquarters on his portable radio.

Detective Hubbard's testimony concerning the events to this point is undisputed. The balance of his testimony is contested, however. According to Hubbard, as he walked toward his cruiser, the appellant, who was seated in the right passenger seat, reached under the seat and grasped what appeared to be a small Derringer pistol. Then Shelton alighted from the car, braced his hand on the Pinto's roof, and pointed the gun at Hubbard. The officer ducked, drew his weapon, and circled his cruiser in a crouched position. When he reached the passenger side of his car, he saw the two remaining occupants exiting it. He ordered them to lie on the ground, and they complied. Then, Hubbard says, he observed Shelton running across the avenue. He called for Shelton to stop. Shelton turned with both hands together in front of him, pointing in Hubbard's direction. Though he concedes he did not see a gun, Hubbard says that he assumed that Shelton was aiming at him. Therefore, he fired one round at Shelton, who grabbed his hip and ran off. Hubbard did not pursue the fleeing suspect. Instead, after arresting the two occupants of the Pinto who were still at the scene, he traced Shelton's path away from the Pinto. He testified that he discovered a loaded .22 caliber Derringer pistol[6] lying a few feet from the car.

Later in the day, Hubbard learned that someone fitting the description of the man involved in the afternoon incident was seeking treatment of a gunshot wound at Leland Memorial Hospital. Hubbard and Detective James Edwards went to Leland Memorial, and the appellant was arrested.

Three witnesses for the defense—Clifton Duke, the driver of the Pinto; Kelly Hailes, an eyewitness; and, Shelton—contested sharply certain crucial parts of Officer Hubbard's story. All testified that the appellant did not have a gun at any time during the incident and that Shelton made no threatening gestures toward Hubbard. Duke testified that Hubbard, who was extremely nervous throughout the event, drew his gun after Shelton opened the car door to relieve the occupants from the heat.[7] He said that Shelton did not stand straight up near the car and did not point in

2. *Id.*

3. 18 U.S.C. § 924(c)(1) (1976).

4. 22 D.C.Code § 3204 (1973).

5. The portions of Detective Hubbard's trial testimony summarized here are found in the transcript (Tr.) at 19–61.

6. The government was unable to obtain fingerprints from the Derringer. Testimony of Colin Alpert, member of the Mobile Cruise Lab, Tr. at 65–66.

7. Tr. at 136.

Hubbard's direction.[8] Rather, Shelton just ran off—with nothing in his hands.[9] Indeed, Duke stated that he had never seen the Derringer before the trial.[10] Ms. Hailes, who lives near the scene and who saw the events in question, testified that she saw Shelton exit the car, look around, and then break into a run. But, she said, Shelton never stood up straight near the car.[11] Finally, Shelton himself testified. He said that when Hubbard, with gun drawn, ordered the occupants out of the car, he panicked.[12] Moved by fear, he said, he jumped up and ran—only to be shot as he crossed the street. Once hit, he ran faster and fled. Contrary to Officer Hubbard's testimony, Shelton stated that he did not turn toward the officer either immediately before or after being shot.[13] Further, he insisted that he never stood straight up by the car or pointed in Hubbard's direction.[14]

It is in the context of this sharp disagreement between the witness for the prosecution and the witnesses for the defense that the challenged line of cross-examination must be set. By cross-examining Clifton Duke, the prosecutor established: (1) that Duke, on a few occasions, had been in the vicinity of 14th and T Streets, N.W.; (2) that he was unemployed; and, (3) that he had $2,600 in his possession, $1,300 of which was in a suitcase in the rear of the Pinto.[15]

By cross-examining Shelton, the prosecutor established that he too was unemployed.[16] Timely objections were made to each point.

## II

It is settled that evidence of other crimes is inadmissible to show criminal propensity or to demonstrate that the defendant is a bad person.[17] Indeed, such evidence is *never* admissible unless it is "necessary"[18] to establish a material fact such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[19] Even then, where the evidence concerns an *alleged crime* which has not been reduced to final judgment, the trial court must make a preliminary finding that there is "clear and convincing evidence" to connect the defendant to the other crime.[20] These carefully delineated rules exist because of the enormous danger of prejudice to the defendant that evidence of other crimes creates. We have recognized before that juries are prone to draw illogical and incorrect inferences from such evidence.[21]

In the case before us, the prosecutor did not openly present evidence of "other crimes." Rather, by innuendo, he painted a picture of Clifton Duke and David Shelton as seedy and sinister characters.

8. Tr. at 142.

9. Tr. at 139–42.

10. Tr. at 154.

11. Tr. at 165.

12. Tr. at 179–80.

13. Tr. at 183.

14. Tr. at 182.

15. Tr. at 156–61. The area of 14th and T Streets, N.W., has long been recognized as a center of narcotics activity. *See e. g., Dorsey v. United States*, 125 U.S.App.D.C. 355, 356 n.1, 372 F.2d 928, 929 n.1 (D.C. Cir. 1967); *Freeman v. United States*, 116 U.S.App.D.C. 213, 322 F.2d 426, 427 (D.C. Cir. 1963).

16. Tr. at 192.

17. *United States v. Bussey*, 139 U.S.App.D.C. 268, 432 F.2d 1330 (D.C. Cir. 1970); *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (D.C. Cir. 1964); *Bracey v. United States*, 79 U.S.App.D.C. 23, 142 F.2d 85 (D.C. Cir.), *cert. denied*, 322 U.S. 764, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944).

18. *United States v. Bussey*, 139 U.S.App.D.C. 268, 273, 432 F.2d 1330, 1335 (D.C. Cir. 1970).

19. Fed.R.Evid. 404(b).

20. *United States v. Bussey*, 139 U.S.App.D.C. 268, 273, 432 F.2d 1330, 1335 (D.C. Cir. 1970).

21. *Drew v. United States*, 118 U.S.App.D.C. 11, 15 n.8, 331 F.2d 85, 89 n.8 (D.C. Cir. 1964). *Cf.* Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .").

This picture showed two unemployed men possessed of a large sum of money, driving in a car which was the subject of an investigation by the Drug Enforcement Administration. And, lest the jury miss the point, the prosecutor directed no fewer than four questions at Duke that were designed to show that he frequented the area of 14th and T Streets, N.W., a known center for narcotics activity.[22] We cannot avoid the conclusion that, in a case the essence of which is common law assault, the prosecutor sought to persuade the jury that the defendant and one of his principal witnesses were members of the drug underworld involved in all sorts of skulduggery.[23]

The evidence produced by the prosecutor's line of cross-examination is not rendered more acceptable by the fact that it is less focused and more subtly adduced than traditional "other crimes" evidence. Quite the contrary. Where the "other crime" alleged is not specified, it is more difficult for the defendant to refute the charge or to demonstrate its insignificance. Where the evidence is presented by innuendo, it is less likely that the jury will guard against manipulation. Therefore, the likelihood that a jury will draw on improper inference is even greater in a case like the one before us than it is in the traditional "other crimes" case.

The government does not seek to justify the prosecutor's line of cross-examination under one of the exceptions contained in Federal Rule of Evidence 404(b). It does not contend that the evidence produced established "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Moreover, the government did not seek a ruling from the trial court that the evidence was "necessary,"[24] and it did not obtain a preliminary finding that there was "clear and convincing evidence"[25] to connect Shelton to the activities imputed to him by innuendo. These requirements, developed to test the admissibility of evidence relating to specific "other crimes," must be attended with even greater care in cases (like the one at hand) involving, at best, speculation regarding other crimes.[26] However, these requirements were ignored by the government.

Perhaps motivated by a realization that important requirements were overlooked at trial, the government limits its argument on appeal to a contention that the evidence produced by the challenged line of cross-examination did not prejudice the jury against Shelton. Counsel for the government cites *Kotteakos v. United States*[27] for the proposition that harmless error does not require reversal. That proposition is clearly correct. But *Kotteakos* itself teaches:

> [I]f one cannot say, with fair assurance, . . . that the judgment [of the jury] was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The

---

**22.** Tr. at 156–57.

**23.** The government argues that Shelton himself was asked only if he was unemployed, that it was Duke who was quizzed about the money and about 14th and T Streets, N.W. But, "[c]oming as it did after a series of questions that established that appellant and his friends were just driving around the city aimlessly on the afternoon of May 24," Government Brief at 8, the question to Shelton was calculated to do much more than "assist the jury in evaluating credibility." *Id.* Given the relationship between Duke and Shelton, and given the fact that they were together in the Pinto at the time of the incident, the cross-examination of Shelton and Duke must be taken as a whole. Viewed in this way, the question about Shelton's unemployment—*especially* coming after a series of questions establishing that he and Duke were "driving around the city aimlessly"

—undeniably might be read by the jury as inferring complicity by Shelton in the deeds imputed to Duke.

**24.** *United States v. Bussey*, 139 U.S.App.D.C. 268, 273, 432 F.2d 1330, 1335 (D.C. Cir. 1970).

**25.** *Id.*

**26.** The government elicited no evidence at trial that would indicate a narcotics violation by either Duke or Shelton. *Cf. United States v. Bass*, 175 U.S.App.D.C. 282, 287 n.7, 535 F.2d 110, 115 n.7 (D.C. Cir. 1976) (evidence of defendant's "high life style" while unemployed held impermissible because jury might infer previous criminal activity).

**27.** 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.[28]

And we have said that in assessing prejudice all serious doubts must be resolved in the defendant's favor.[29]

The government relies exclusively on *United States v. Turner*[30] in arguing that the line of questioning at issue here was not prejudicial to the appellant. The defendant in *Turner* was prosecuted for facilitating the concealment and the sale of heroin. The government had introduced evidence that when arrested the defendant was unemployed and in possession of $3000. We held that this evidence was properly admitted because it demonstrated the defendant's financial ability to purchase narcotics.[31] The prosecutor, however, had suggested in his closing argument that the defendant was, in fact, a narcotics trafficker. We held that this was an impermissible reference to other crimes.[32] But we also held that, because the reference to trafficking was "an insignificant part of an extended argument,"[33] there was no reversible error.

We did say, however, that the prosecutor's argument was "perilously close to reversible error."[34] And, we added that, even in future *narcotics* cases,

> [t]he government should limit its proof and argument to those showing that the defendant had the means to commit *the crime charged* and should assiduously avoid any shred of implication that the government asserts that a defendant engages in such transactions generally.[35]

In the case before us, the government did not "limit its proof and argument" appropriately. Nor was the challenged evidence merely an "insignificant part" of the prosecutor's case. Rather, it was part of a conscious effort to portray the defendant as an undesirable, a member of the drug underworld, and, thus, a person who was likely to be guilty of assault—or of something. Such an effort is impermissible. And, in this case, while there was other evidence of appellant's guilt, it was sharply disputed. In such circumstances, it cannot be said that the "wild card" introduced by the prosecutor's portrayal of the defendant as a criminal type did not hold sway—it cannot be said "that the error did not influence the jury."[36] Any careful review of the record

---

**28.** *Id.* at 765, 66 S.Ct. at 1248; *See also Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963) ("The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."). *Accord Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). In a section of its brief, the government argues that the credibility of both Duke and Shelton may have been impeached on grounds other than the evidence adduced by the challenged line of cross-examination, and that, therefore, the evidence was harmless. This argument is wrong. First, it assumes—incorrectly—that the only adverse impact of the evidence was upon credibility. Second, even granted that assumption, *Kotteakos* teaches: "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." 328 U.S. at 765, 66 S.Ct. at 1248.

**29.** *United States v. Freeman*, 169 U.S.App.D.C. 73, 79–80, 514 F.2d 1314, 1320–21 (D.C. Cir. 1975).

**30.** 158 U.S.App.D.C. 197, 485 F.2d 976 (D.C. Cir. 1973).

**31.** Clearly, this part of our holding in *Turner* does not bear on the instant case. There is no connection between the defendant's financial status and his ability to commit assault.

**32.** This part of our holding in *Turner* supports our finding that the evidence at issue in the instant case was inadmissible. Whereas there was at least a remote connection between the financial status of the defendant in *Turner* and the crime with which he was charged, there is no connection between Shelton's financial status and the crime of assault.

**33.** *United States v. Turner*, 158 U.S.App.D.C. 197, 203, 485 F.2d 976, 982 (D.C. Cir. 1973).

**34.** *Id.*

**35.** *Id.* (emphasis added).

**36.** *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). *United States v. Bussey*, 139 U.S.App.D.C. 268, 272, 432 F.2d 1330, 1334 (D.C. Cir. 1970). *Cf. Hawkins v. United States*, 358 U.S. 74, 79, 79

in this case must raise grave doubts about the basis of the jury's verdict of guilty. We cannot blink that reality. Therefore, we reverse.

*Reversed and remanded for a new trial.*

S.Ct. 136, 139, 3 L.Ed.2d 125 (1958); *Bollenbach v. United States*, 326 U.S. 607, 613–14, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946); *Macklin v. United States*, 133 U.S.App.D.C. 347, 410 F.2d 1046 (D.C. Cir. 1969).